# IN THE UNITED STATES DISTRICT COURT FOR
# THE WESTERN DISTRICT OF MISSOURI

PATRICK ROMANO, et al.,          )
                                 )
             Plaintiffs,          )
                                 )
v.                               )          Case No. 23-04043-CV-BCW
                                 )
TORCH ELECTRONICS, LLC, et al.,  )
                                 )
             Defendants.          )


## DEFENDANTS TORCH ELECTRONIC, LLC, STEVEN MILTENBERGER, AND WARRENTON OIL COMPANY'S JOINT SUGGESTIONS IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................ 1

II.    STATEMENTS OF FACT ..................................................................... 1

       Torch Device Operation and Play ................................................... 2

       Plaintiffs' History Playing Torch Devices ...................................... 4

       Plaintiffs' Claimed Damages .......................................................... 7

III.   LEGAL STANDARD .......................................................................... 9

IV.    ARGUMENT ....................................................................................... 10

       A. Plaintiffs are Not Adequate to Represent the Class ................... 10

       B. The Class Is Not Ascertainable ................................................. 13

       C. The Class Action Device is Not Superior Because the Central Legal
          Issues about Missouri Gambling Laws Better Resolved Without
          Reference to a Class ................................................................... 16

       D. Commonality, Typicality, and Predominance are Not Satisfied Because
          of the Individualized Determinations Required by Plaintiffs' Claims .. 17

          1. RICO Claim ......................................................................... 17

          2. MMPA Claim ...................................................................... 18

          3. Mo. Rev. Stat. § 434.030 Claim .......................................... 22

       E. Plaintiffs Lack Evidence to Support Class Certification ............ 22

V.     CONCLUSION ................................................................................... 23

CERTIFICATE OF SERVICE ...................................................................... 24

# TABLE OF AUTHORITIES

**Case**                                                                                    **Pages**

*Ackal v. Centennial Beauregard Cell. L.L.C.,*
    700 F.3d 212 (5th Cir. 2012) ............................................................................ 14

*Avritt v. Reliastar Life Ins. Co.,*
    615 F.3d 1023 (8th Cir. 2010) .......................................................................... 17

*Barfield v. Sho-Me Power Elec. Co-op.,*
    11-CV-04321-NKL (W.D. Mo. 2013) ............................................................ 13

*Barfield v. Sho-Me Power Elec. Coop.,*
    852 F.3d 795 (8th Cir. 2017) ............................................................................ 13

*Barnes v. Am. Tobacco Co.,*
    161 F.3d 127 (3d Cir. 1998) ............................................................................. 18

*Boca Raton Cmty. Hosp., Inc. v. Tenet Healthcare Corp.,*
    238 F.R.D. 679 (S.D. Fla. 2006) ..................................................................... 12

*Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.,*
    582 F.3d 1227 (11th Cir. 2009) ....................................................................... 12

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013) ..................................................................................... 17, 22

*EQT Prod. Co. v. Adair,*
    764 F.3d 347 (4th Cir. 2014) ........................................................................... 16

*Gallagher v. Magner,*
    619 F.3d 823 (8th Cir. 2010) ........................................................................... 18

*Grimes v. Fairfield Resorts, Inc.,*
    331 Fed. Appx. 630 (11th Cir. 2007) .............................................................. 11

*Halvorson v. Auto-Owners Ins. Co.,*
    718 F.3d 773 (8th Cir. 2013) ........................................................................... 18

*Hansberry v. Lee,*
    311 U.S. 32 (1940) .......................................................................................... 10

*Howard v. Cook Cnty. Sheriff's Off.*,
   989 F.3d 587 (7th Cir. 2021) .................................................................. 23

*Hudock v. LG Elec. U.S.A., Inc.*,
   12 F.4th 773 (8th Cir. 2021) .................................................................. 21

*In re MasterCard Int'l Inc.*,
   313 F.3d 257 (5th Cir. 2002) .................................................................. 20

*In re MasterCard Int'l Inc., Internet Gambling Litig.*,
   132 F. Supp. 2d 468 (E.D. La. 2001) ..................................................... 20

*In re Niaspan Antitrust Litig.*,
   464 F. Supp. 3d 678 (E.D. Pa. 2020) ..................................................... 15

*In re Tetracycline Cases*,
   107 F.R.D. 719 (W.D. Mo. 1985) ........................................................... 14

*Jenkins v. Pech*,
   2015 WL 3658261 ................................................................................. 15

*Kent v. SunAmerica Life Ins. Co.*,
   190 F.R.D. 271 (D. Mass. 2000) ............................................................. 14

*Kern v. Siemens Corp.*,
   393 F.3d 120 (2d Cir. 2004) .................................................................. 14

*Luiken v. Domino's Pizza, LLC*,
   705 F.3d 370 (8th Cir. 2013) .................................................................. 9

*Martin v. JTH Tax, Inc.*,
   2013 WL 442425 ................................................................................... 13

*Owen v. Gen. Motors Corp.*,
   533 F.3d 913 (8th Cir. 2008) ........................................................... 19, 20

*Phillips Petrol. Co. v. Shutts*,
   472 U.S. 797 (1985) .............................................................................. 14

*Poulos v. Caesars World, Inc.*,
   379 F.3d 654 (9th Cir. 2004) ........................................................... 18, 21

iv

*Prantil v. Arkema Inc.*,
   986 F.3d 570 (5th Cir. 2021) ..........................................................................23

*Roberts v. C.R. England, Inc.*,
   321 F. Supp. 3d 1251 (D. Utah 2018) .............................................................14

*Ruffu v. Johnson & Johnson, Inc.*,
   181 F.R.D. 341 (E.D. Tex. 1998) ............................................................18, 22

*State ex rel. Coca-Cola Co. v. Nixon*,
   249 S.W.3d 855 (Mo. 2008) ...........................................................................21

*State of Minn. v. U.S. Steel Corp.*,
   44 F.R.D. 559 (D. Minn. 1968) .......................................................................16

*Thorne v. U.S. Bancorp*,
   2021 WL 1977126 ...........................................................................................12

*Tucker v. Gen. Motors LLC*
   58 F.4th 392 (8th Cir. 2023) ...........................................................................19

*U.S. Fid. & Guar. Co. v. Lord*,
   585 F.2d 860 (8th Cir. 1978) ...........................................................................10

*Valley Drug Co. v. Geneva Pharm., Inc.*,
   350 F.3d 1181 (11th Cir. 2003) ................................................................11, 12

*Vitello v. Natrol, LLC*,
   50 F.4th 689 (8th Cir. 2022) ...........................................................................19

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ..................................................................................10, 17

*White v. Just Born, Inc.*,
   2018 WL 3748405 ...........................................................................................21

*Wooley v. Jackson Hewitt, Inc.*,
   2011 WL 1559330 ...........................................................................................13

*Zinser v. Accufix Research Inst.*,
   253 F.3d 1180 (9th Cir. 2001) .........................................................................16

v

*Zinser v. Accufix Research Inst., Inc., opinion amended on denial of reh'g,*
    273 F.3d 1266 (9th Cir. 2001) ........................................................................ 16

**STATUTES AND REGULATIONS**

15 CSR 60-9.030(1) ............................................................................................ 19

7AA Fed. Prac. & Proc. Civ. §1780 (3d ed.) ................................................... 16

Fed. R. Civ. P. 23(a) ................................................................................ *passim*

Fed. R. Civ. P. 23(b)(3) .......................................................................... *passim*

R.S.Mo. § 313.004.1 ......................................................................................... 20

R.S.Mo. § 313.004.4 ......................................................................................... 20

R.S.Mo. § 434.030 ............................................................................................... 1

R.S.Mo. § 572.010(4) ....................................................................................... 11

R.S.Mo. § 572.020 ............................................................................................ 12

R.S.Mo. § 558.002 ............................................................................................ 12

R.S.Mo. § 558.011 ............................................................................................ 12

Case 2:23-cv-04043-BCW   Document 70   Filed 07/14/23   Page 6 of 30

# I.	INTRODUCTION

Plaintiffs' Motion and Suggestions in Support is long on conclusory statements and hyperbole and short on explaining how this case meets the critical requirements of Rule 23. Plaintiffs fail to satisfy Rule 23 because: (1) Plaintiffs cannot adequately represent a class; (2) Plaintiffs propose no methodology for ascertaining class members; (3) Torch's[1] pending declaratory judgment action set for trial in the Circuit Court of Cole County, Missouri, to decide the legality of Torch devices negates the need for this Court to entertain a class action; and (4) Plaintiffs' claims require individualized determinations that cannot meet commonality, typicality, and predominance requirements. Plaintiffs' request for class certification should be denied.

# II.	STATEMENTS OF FACT

1.	Plaintiffs are seven Missouri individuals who allege that they have spent more money than they have gotten back playing Torch's amusement devices. (*See* Compl., ¶¶ 2-8 and 76-85 (Doc. 1 at 2 and 17-21)).

2.	Plaintiffs seek to recover these amounts (plus statutory penalties) based on the overarching theory the devices are illegal slot machines under Missouri law. Plaintiffs assert three counts on behalf of a putative class: Civil RICO (Count I), Violations of the Missouri Merchandising Practices Act ("MMPA") (Count II), and Money Lost under § 434.030, RSMo. (Count III). (*See generally* Doc. 1 at 27-42).

3.	Plaintiffs filed this lawsuit on March 3, 2023. (*See generally id.* (Doc. 1)).

4.	No Defendant has yet answered; instead, all have filed currently pending motions to dismiss. (*See* Docs. 28-29, 37-38, and 41-42).

---

[1] Defendants Torch Electronics, LLC, Steven Miltenberger, and Warrenton Oil Company are collectively referred to herein as "Torch."

5. During briefing on Motions to Dismiss and before any certification-related discovery, on May 5, 2023, Plaintiffs filed their Motion for Class Certification accompanied by a 29-page supporting brief while moving for leave to file the excess pages. (*See* Docs. 30-32).

6. On May 12, the Court denied the motion for leave. (Doc. 34). Plaintiffs filed their operative Suggestions in Support within the 15-page limit on May 15. (Doc. 36).

7. In their Motion for Class Certification, Plaintiffs move under Rule 23(b)(3) to certify a class of persons defined as follows:

> All natural persons who deposited money into any electronic gaming device owned or operated by Torch Electronics, LLC, in the State of Missouri and not located on the premises of a Missouri-licensed casino on any one or more days on or after March 3, 2018 and who received back following their play an amount of money less than the amount deposited that day.

Mot. Certification (Doc. 30 at pp. 1-2).

## Torch Device Operation and Play

8. Unlike regulated casino slot machines, Torch's amusement devices contain predetermined outcomes and, prior to any given play, give the player the option of previewing the outcome in advance. *See generally* Declaration of N. Farley, a true and correct copy of which is attached as **Exhibit A**.[2]

9. Most devices contain five different game themes. (*Id.* at ¶ 4).

10. The player initiates game play by touching the "PLAY" icon on the screen or the device cabinet. (*Id.* at ¶ 7).

11. The game outcomes and prizes are "based on predetermined finite outcomes that are in sequential order." (*Id.* at ¶ 8).

---

[2] Mr. Farley's declaration describes one Torch device, but as Plaintiffs note, the devices share core features. (*See* Pls.' Sugg. Supp. Mot. Certification ("Torch's devices are all made by the same manufacturer and all run the same or substantially similar software.") (Doc. 36 at 6)).

2

12.     All game outcomes after the initial game outcome selected are delivered sequentially from the appropriate predetermined finite pool. (*Id.*).

13.     Additionally, unlike regulated Missouri casino slot machines, Torch devices do not utilize a random number generator to determine the outcome of a game or the prize awarded. (*Id.* at ¶ 8).

14.     Instead, the outcomes and prizes are "based on predetermined finite outcomes that are in sequential order." (*Id.*).

15.     The Torch device software does not randomize or shuffle outcomes based on play, and it does not allow any operator interaction with the machine to alter the predefined game outcomes. (*Id.* at ¶ 7). Neither the player nor the operator can affect the game outcomes. (*Id.*).

16.     For any game available for play with the Torch device, there is a "Prize Viewer" feature that allows the player to push the "Prize Viewer" icon on the screen at any time prior to the play of a given turn and view upcoming game outcomes. (*Id.* at ¶ 4). This "Prize Viewer" feature allows the player to view upcoming game outcomes on the screen without committing to any payment or purchase. (*Id.*). The player can then choose to either play the turn for the predetermined outcome as displayed to the player using the Prize Viewer feature, or not play the turn and exit the game. (*Id.* at ¶ 5). If a player has deposited money into the device prior to the initiation of game play, the player can get a refund of the player's money. (*Id.*).

17.     Because of the way Torch devices are designed to operate using outcomes determined sequentially from a predetermined finite pool and "Prize Viewer" feature allowing a prospective player to preview outcomes if the player chooses to use the feature and play a turn, on any given play of the game on the Torch Device, chance (a/k/a luck) does not play a role. (*Id.* at ¶ 9).

**Plaintiffs' History Playing Torch Devices[3]**

18.    While Plaintiffs all say they have played the devices, their play histories differ significantly. Romano, for instance, has only played the devices three times, all in 2023. (*See* Deposition of Patrick Romano, taken 6/16/2023 ("Romano Dep."), a true and correct copy of excerpts from the same is attached as **Exhibit B**, 13:14-25). On the other end of the spectrum is Cordaro, who cannot describe with certainty how frequently he has played the devices but estimates that he plays on more days per year than he does not. (*See* Deposition of Jeffrey Cordaro, taken 6/19/2023 ("Cordaro Dep."), a true and correct copy of excerpts from the same is attached as **Exhibit C**, 20:5-21:3 (estimating he plays 60% of all days)).

19.    Except for Mr. Romano, who asserted he has written down his recollections of the only three instances he allegedly played a Torch device, the other Plaintiffs are not generally able to recall with specificity the various instances that they allegedly played Torch devices. (*See, e.g.,* Deposition of Mary Bolden, taken 6/20/2023 ("Bolden Dep."), a true and correct copy of excerpts from the same is attached as **Exhibit D**, 13:17-14:7, 33:25-35:9; Cordaro Dep. 20:5-21:3, 55:7-16, 67:5-8; Deposition of Monica McGee, taken 6/20/2023 ("McGee Dep."), a true and correct copy of excerpts from the same is attached as **Exhibit E**, 14:18-15:5, 20:8-24, 32:3-18, 38:20-25; Deposition of Carmen Weaver, taken 6/16/2023 ("Weaver Dep."), a true and correct copy of excerpts from the same is attached as **Exhibit F**, 36:18-37:6, 46:12-47:6; Deposition of Joshua Wilson, taken 6/7/2023 ("Wilson Dep."), a true and correct copy of excerpts from the same is attached as **Exhibit G**, 71:20-73:9).

---

[3] Defendants were able to depose six of the seven named plaintiffs regarding class certification issues, but Defendants were unable to depose Plaintiff Krystal Christensen. Accordingly, broad discussions of "Plaintiffs" general collective testimony below are based on testimony of all named Plaintiffs except Ms. Christensen.

4

20.     Some Plaintiffs say they knew they were playing Torch's devices based on branding; others only came to believe they played Torch devices after being told by their lawyers. (*See, e.g.,* Bolden Dep. 15:23-16:12; McGee Dep. 21:19-22:3).

21.     Plaintiffs agree they played Torch devices voluntarily. (*See* Bolden Dep. 40:11-16; Cordaro Dep. 34:18-25; McGee Dep. 44:6-10; Romano Dep. 25:5-7; Weaver Dep. 28:17-21; Wilson Dep. 70:17-71:1). And no Plaintiff alleges to have read or relied on any statements or disclosures by Torch regarding how the devices worked or otherwise. (Weaver Dep. 30:13-31:9; Cordaro Dep. 21:4-22:23; Wilson Dep. 92:7-93:4; Bolden Dep. 14:8-15:1; McGee Dep. 20:25-21:18; Romano Dep. 16:14-22).

22.     Several Plaintiffs say they enjoy playing the games on Torch devices and anticipate that there are many others who enjoy the games as well. (*See* Bolden Dep. 28:4-15 (plays because "that's what [she] like[s] to do," and acknowledging that others "play for entertainment"); Cordaro Dep. 65:4-66:2 (acknowledging that he likes the games, especially "Kitty Cash," for the "graphics and whatever"); McGee Dep. 33:3-12 (sometimes has fun playing the games); *but see* Romano Dep. 16:23-17:8 (while he otherwise is not a gambler, says he played the Torch Devices on three specific occasions because he "wanted to win money"); Cordaro Dep. 15:9-25, 34:3-35:5 (claiming he plays because he has a gambling addiction)).

23.     Plaintiffs differ on whether they have previously used the Prize Viewer feature of the devices. (*See* Bolden Dep. 73:21-74:7 (claimed to no know about Prize Viewer feature); McGee Dep. 49:15-51:7 (claimed to have never used Prize Viewer feature but agreed that if it exists the games are not games of chance); Romano Dep. 56:13-57:16; 58:6-19 (allegedly unaware of Prize Viewer feature but agreed that it is not gambling if the outcome of the turn is already known); Weaver Dep. 73:7-11, 74:7-14 (allegedly not aware of the feature); *compare* Cordaro Dep. 70:20-

5

72:19 (admitted to knowing the Prize Viewer feature exists and explained how it allows the player to preview the outcome of a turn before gameplay, admitted to having used the Prize Viewer and seeing other people using the feature)).

24. Several Plaintiffs agreed that prospective class members played Torch devices for many different reasons, for different amounts of time, and different amounts of money. (*See, e.g.,* Weaver Dep. 40:10-41:21; Romano Dep. 34:9-35:5 (agreeing he may not be typical of other Torch device players regarding his motive for playing a Torch device, the length of time he plays a Torch device, or personal struggles with a potential gambling addition)). With respect to the individualized nature of the case and potential issues related to it, Plaintiff Cordaro testified as follows:

> Q: Let me unpack that for a second. Cause you just said to figure out whether you're typical or atypical, the same or different, we'd have to look at every individual and their facts and circumstances individually, correct?
> A: Sure. I mean, I don't understand why you're saying I'm so – I'm not a typical.
> Q: I'm not saying anything. I'm asking you questions.
> A: Well, you stated it that I was.
> Q: Mr. Cordaro, is it fair to say, though, as I just asked, and I believe you just answered, that we would have to look at everyone in an individualized capacity to figure out why they play, how frequently they play –
> A: Yes.
> Q: -- whether they have?
> A: Yes. Yes.
> Q: -- additions – please let me finish my question – whether they have addition, whether they've won or lost, how long they've played, whether they relied on anything to play [the Torch devices]. We'd have to look at those individually, correct?
> A: I don't' know what you're getting at to do it –
> Q: It's a yes or no question.
> A: -- but if you're – you know, if you're analyzing the history of individual gamblers, then, yeah, sure.

(Cordaro Dep. 53:6-54:10). Plaintiffs Cordaro and Wilson also claim they have struggled with a gambling addiction, a problem not all named Plaintiffs seem to have. (*See* Decl. of J. Cordaro (Doc. 30-4 at ¶ 5); Wilson Dep. 70:9-16).

6

<u>Plaintiffs' Claimed Damages</u>

25.     Most named Plaintiffs say their primary interests are in having Torch's devices removed, but they acknowledge some other players/potential class members might not want that result. (*See* Bolden Dep. 38:21-39:19; Cordaro Dep. 45:17-21 (interest in being a class representative is to see to it that "Torch Electronics goes up in flames"), 76:21-77:15 (does not know what other individuals want, but says he "do[es]n't care" if he gets a dime in compensation, only cares that the machines are removed); McGee Dep. 41:7-15 (wants the devices "remove[d] . . . if they're illegal, or have it where the kids can't get to it"); 43:6-15 (is "[a]bsolutely not" in this lawsuit for the money though some people might want money damages); Romano Dep. 27:6-16 (does not want money, wants "[t]he machines taken off the street"); Weaver Dep. 52:19-55:6 (while what she wants is for the machines to "be regulated," other persons who play the games would not want the same thing, and some would want the number of available devices to increase rather than decrease; agreeing "[w]e would have to ask each [Torch device player] individually" what outcome they would like to see in this litigation)).

26.     Other than Plaintiff Romano (who claims to have played a Torch device on three occasions, allegedly losing $41 in total), Plaintiffs lack a way to quantify how much money they have lost on the devices. (*See* Bolden Dep. 33:25-35:9 (she does not know and does not have records evidencing how much she has allegedly lost playing Torch devices); McGee Dep. 36:21-37:17, 38:20-25 (while she does keep some relevant records, she does not know and would not be able to come up with how much she has allegedly lost); Weaver Dep. 46:12-47:6 (cannot give a "ballpark" on how much she has spent playing Torch devices); Wilson Dep. 71:20-73:9; Romano Dep. 14:11-16).

27.     Several Plaintiffs claim to have won money playing Torch devices on different occasions. (*See* Weaver Dep. 28:11-13; Cordaro Dep. 33:9-12; *but see* Bolden Dep. 26:23-27:16 (claims that while she has won money on various plays, she has never cashed out with more than she put in); McGee Dep. 35:19-36:14 (claims she has never won on a Torch device)).

28.     At least some Plaintiffs admitted that to determine whether any prospective absent class member was allegedly damaged (and, by extension, whether they fell within Plaintiffs' proposed class definition) necessarily requires investigating each alleged class member's playing history and alleged losses compared to alleged wins on an individualized basis. (*See, e.g.,* Cordaro Dep. 53:6-54:10, 54:25-55:6 (Q: "To determine whether a particular Torch player won or lost from using Torch devices, we'd have to look at their situation individually, correct?" A: "Yeah, their won/loss total, sure." Q: "'Yes?'" A: "Yes. You'd have to look at each individual individually.").

29.     Several Plaintiffs also acknowledge that if their theory of the case is hypothetically assumed true (*i.e.*, Torch devices are illegal "gambling devices" under Missouri law) then it is possible playing Torch devices could be viewed as criminal in nature because "illegal gambling" is a crime under Missouri law.[4] (*See* Wilson Dep. 81:13-18 (testifying that when he played a Torch device, he subjectively believed he was gambling on the device); Bolden Dep. 53:25-54:3 (agreeing that her testimony is that she committed the crime of gambling when playing Torch devices), 42:5-10 (testifying "I believe [Torch devices] are illegal because of what my lawyer said"); Cordaro Dep. 58:1-5 (testifying that if, as Plaintiffs allege, Torch devices are illegal then he "committed a criminal offense" by using them to illegally gamble); Romano Dep. 41:17-42:6 (claims he "did not commit a crime in [his] mind" because at the time he did not believe the machines were illegal), 26:21-27:5

---

[4] Torch denies Torch devices are "gambling devices" under Missouri law and, thus, it is impossible for Plaintiffs or others to illegally gamble on Torch devices. (*See* Section II, ¶¶ 8-17).

(testifying he only believes the Torch devices are illegal because his attorney claims Torch devices are illegal); McGee Dep. 53:9-15 (testifying she did not think she was committing a crime when she allegedly played Torch devices in the past because she did not believe they were illegal), 28:14-20 (testifying she now believes Torch devices are illegal because her attorney told her they are allegedly illegal); Weaver Dep. 62:22-63:12 (answering whether she is admitting to a crime with "I guess so"), 84:6-85:23 (agreeing that other people who have played the devices might want to assert Fifth Amendment privilege in response to questioning about gambling and their potential use of a Torch device)). Plaintiff Waver's testimony is illustrative:

> Q:    In this lawsuit, you're saying that these Torch devices constitute illegal gambling, correct?
> A:    Correct.
> Q:    Knowingly engaging in illegal gambling is a crime.
> A:    That's correct. That's why I haven't gambled since this lawsuit cause I thought the[] [Torch devices] were legal.
> Q:    So, is it fair to say that some members of your proposed class action, meaning some people who aren't named here –
> A:    I gotcha.
> Q:    -- but who might fall into this proposed class of people –
> A:    Yes, sir.
> Q: -- and you're asking the court to certify as a class, might want to take the Fifth in response to the question of whether they committed a crime?
> A:    They might.
> Q:    It makes sense, right?
> A:    Yeah.
> Q:    Some people might say in response to a question of are you under oath committing – admitting to committing a crime, they might say, you know, I'm not going to answer that question –
> A:    Yeah.
> Q:    -- I'm going to assert my Fifth Amendment privilege, correct?
> A:    Like I say, correct.

(Weaver Dep. 84:19-85:23).

## III.    LEGAL STANDARD

It is Plaintiffs' burden to prove the class should be certified and the requirements of Rule 23 are met. *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 372 (8th Cir. 2013). Plaintiffs seek

certification of a Rule 23(b)(3) damages class action; accordingly, Plaintiffs must first establish numerosity, commonality, typicality, and adequacy of representation, and then predominance of common questions of law or fact and the superiority of a class action over other procedures. *See* Fed. R. Civ. P. 23(a) and (b)(3). "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis in original) (explaining class certification can occur only after a "rigorous analysis" demonstrating all four requirements of Rue 23(a) and (b)(4) are satisfied).

## IV.     ARGUMENT

### A.      Plaintiffs are Not Adequate to Represent the Class

Plaintiffs have two inherent conflicts of interest with the proposed class: first, Plaintiffs seek to remove Torch's devices from the stream of commerce in Missouri. (*See, e.g.,* Doc. 36, p. 14 of 21),[5] which is contrary to the interest of those class members who regularly enjoy playing Torch's devices; and second, Plaintiffs' claims are premised on Torch devices being illegal "gambling devices" under Missouri law, which exposes both Plaintiffs and class members to potential criminal liability.

The Rule 23(a)(4) adequacy requirement is not satisfied if the named plaintiffs "have interests antagonistic to those of the class." *U.S. Fid. & Guar. Co. v. Lord*, 585 F.2d 860, 873 (8th Cir. 1978). Because class action representatives seek to bind non-litigants to a judgment, Constitutional Due Process requires their interests align with absent class members. *See Hansberry*

---

[5] Plaintiffs cannot use Rule 23(b)(3) to certify an injunctive relief class, but from a practical standpoint, if they did receive their requested relief (which, on their theories, hinges on a legal determination that Torch's amusement devices are illegal gambling devices), Torch's current devices would no longer be able to be operated legally in Missouri.

10

*v. Lee*, 311 U.S. 32, 45 (1940) ("[A] selection of representatives for purposes of litigation, whose substantial interests are not necessarily or even probably the same as those whom they are deemed to represent, does not afford that protection to absent parties which due process requires."). "[F]or purposes of analyzing whether any antagonistic interests exist between the proposed representatives and the rest of the class, the defendant does not have to show actual antagonistic interest; the potentiality is enough[.]" *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1194 (11th Cir. 2003) (quotation marks omitted).

Here, class members who want to continue to play Torch devices have interests adverse to Plaintiffs.' *See Grimes v. Fairfield Resorts, Inc.*, 331 Fed. Appx. 630, 633 (11th Cir. 2007) (upholding denial of class certification where "it appears that a significant number of class members enjoy the very programs about which Plaintiffs complain"); *see also* Section II, ¶ 22. Further, Plaintiffs' claims threaten to violate significant Constitutional rights of absent class members considering Plaintiffs' claims are premised on Torch devices being illegal "gambling devices" under Missouri law. (*See, e.g.,* Compl., ¶¶ 88(a)-(b) (Doc. 1 at 22) (identifying as a "common question" whether playing Torch devices is gambling); *id*. at ¶¶ 109-111 (alleging playing Torch devices constitutes gambling under Missouri law)). If so, Missouri law also criminalizes illegal gambling, and if Plaintiffs prevail, they expose themselves and subsequently-identified class members to potential criminal liability. Torch denies Torch devices allow players to "gamble" because the devices involve no element of chance.[6] (*See* Section II. 8-17). But Plaintiffs' theory inherently creates a risk of criminal prosecution for every class member.

---

[6] RSMo. § 572.010(4) defines "Gambling," in relevant part, as occurring when a person, "stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his or her control or influence, upon an agreement or understanding that he or she will receive something of value in the event of a certain outcome."

11

Under RSMo. § 572.020, anyone who "knowingly engages in gambling" is guilty of at least a class C misdemeanor (up to 15 days in jail/$700 in fines) and, under certain facts, a class A (up to 1 year imprisonment/$2,000 fines) or B (up to 6 months imprisonment/$1,000 fines) misdemeanor. *See* RSMo. §§ 558.011 and 558.002. Plaintiffs' claims demand Plaintiffs *prove* Torch devices are illegal gambling devices and thus its users are illegal gamblers. As a result, prospective class members may unwittingly admit to criminal conduct by joining Plaintiffs' class action. Tellingly, several Plaintiffs testified they subjectively believed they were illegally gambling. (*See* Plts.' Sugg. Opp'n Mot. Dismiss at 13 (Doc. 35 at p. 17 of 18) ("Yes, Consumers were gambling."); *see also* Section II, ¶ 29). As Plaintiff Weaver noted, potential class members might not want to make such admissions or be implicated as a potential illegal gambler. (*Id.*).

For many prospective class members, their interests are more aligned with Defendants, whose position is that playing Torch devices is perfectly legal under Missouri law. (*See, e.g.*, Doc. 29 at pp. 13-14). But the issue of whether Plaintiffs illegally gambled is inescapable, and it would violate due process and Fifth Amendment rights to litigate absent class members' criminal liability without their presence in court through their own choice of counsel. Plaintiffs cannot satisfy the adequacy requirement, and the class should not be certified. *See Thorne v. U.S. Bancorp*, CV 18-3405 (PAM/KMM), 2021 WL 1977126, at *2 (D. Minn. May 18, 2021) (where some class members would be harmed by the relief sought, there is a "fundamental conflict" defeating adequacy); *see also Boca Raton Cmty. Hosp., Inc. v. Tenet Healthcare Corp.*, 238 F.R.D. 679, 697 (S.D. Fla. 2006), *aff'd sub nm. Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227 (11th Cir. 2009) (class conflicts prohibited class certification where, among other things, some class members would have potential exposure for illegality under the plaintiff's civil RICO theory); *Valley Drug Co.*, 350 F.3d at 1189 (there is a "fundamental conflict" precluding

12

certification where the class representatives' "interests are actually or potentially antagonistic to, or in conflict with, the interests and objectives of other class members"); *Wooley v. Jackson Hewitt, Inc.*, No. 07 C 2201, 2011 WL 1559330, at *11 (N.D. Ill. April 25, 2011) (denying certification in part because "numerous class members [] would be subject to an *in pari delicto* defense"); *Martin v. JTH Tax, Inc.*, No. 9:10-cv-03016-DCN, 2013 WL 442425, at *8 n.5 (D.S.C. Feb. 5, 2013) (denying class certification because defenses of *in pari delicto* and unclean hands would require individualized inquiries and proof).

## B. The Class Is Not Ascertainable

Plaintiffs' proposed class includes everyone within a five-year span who, on any given day, put more money into Torch's devices than the person received back that day. (See Doc. 36, p. 4). Yet, Plaintiffs fail to explain how they plan to identify and contact prospective class members.

It must be possible in theory and feasible in practice to discern who is in the class. *See Barfield v. Sho-Me Power Elec. Co-op.*, 11-CV-04321-NKL, 2013 WL 3872181, at *12 (W.D. Mo. July 25, 2013), *aff'd sub nom. Barfield v. Sho-Me Power Elec. Coop.*, 852 F.3d 795 (8th Cir. 2017). As a threshold problem, Plaintiffs fail to present a cogent plan for identifying class members. Plaintiffs offer no opinions by a class notice expert. Plaintiffs simply claim "[h]ere, class certification is not a close question," without discussing how class membership can be ascertained. (Doc. 36, p. 9). More problematic, Plaintiffs implicitly ask the Court to certify an *opt-in* class because there is no manageable way to identify the persons meeting Plaintiffs' class definition without asking individuals to effectively opt-in to the class. However, Rule 23(b)(3) does not allow for opt-in classes, and Plaintiffs' proposed class creates untenable ascertainability and manageability issues requiring individualized findings of fact to determine if a given person is, in fact, a viable class member.

Plaintiffs implicitly propose an impermissible opt-in class where individuals must

13

affirmatively do something in order to be included within the class (*e.g.*, go to a website and self-identify or call a hotline and do the same). *See Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 810 (1985) ("Unlike a defendant in a normal civil suit, an absent class-action plaintiff is not required to do anything."); *see also Roberts v. C.R. England, Inc.*, 321 F. Supp. 3d 1251, 1256, n.31 (D. Utah 2018) ("[N]o court has ever certified an opt-in class under 23(b)(3), and courts have denied certification of classes for which plaintiffs request an opt-in provision."). Additionally, given the potential illegal gambling and Fifth Amendment implications discussed above, Rule 23(b)(3) is not a vehicle for certifying a class where consent or waiver of rights for inclusion in the class is necessary. *See Kern v. Siemens Corp.*, 393 F.3d 120, 128–29 (2d Cir. 2004) (proposed 23(b)(3) class that would require affirmative consent to inclusion in class was improper; remanding with instructions to deny certification); *Ackal v. Centennial Beauregard Cell. L.L.C.*, 700 F.3d 212, 217–19 (5th Cir. 2012) ("There is no authority for establishing 'opt-in' classes in which class members must take action to be included in the class.") (alteration omitted).

An opt-out opportunity is required to satisfy due process. *See Phillips Petroleum Co.*, 472 U.S. at 812. Of course, given the lack of a way to identify the members in the class based on the definition, many—likely, the vast majority of—members of the defined class would never be given proper notice or the opportunity to opt-out as due process requires. The "class" would be an abstraction only, which fails to satisfy Rule 23(b)(3). *See Barfield*, 11-CV-04321-NKL, 2013 WL 3872181, at *12; *see also In re Tetracycline Cases*, 107 F.R.D. 719, 728 (W.D. Mo. 1985) ("[T]he proposed class [can]not be amorphous, vague, or indeterminate . . . [I]t [must be] administratively feasible to determine whether a given individual is a member of the class."); *Kent v. SunAmerica Life Ins. Co.*, 190 F.R.D. 271, 278 (D. Mass. 2000) ("[A] class must be unambiguously defined in order for a court to decide and declare who will receive notice, who will share in any recovery, and

14

who will be bound by the judgment."); *In re Niaspan Antitrust Litig.*, 464 F. Supp. 3d 678, 707 (E.D. Pa. 2020) (denying certification when plaintiffs failed to "show[] they can identify class members through a reliable and administratively feasible mechanism").

Further, Plaintiffs' proposed class necessarily requires individual factual inquiry with respect to every purported absent class member to confirm class membership. (*See* Section II, ¶¶ 24, 27-28). It is not enough to have played a Torch device; class members must have spent more money on a given day than they received. This is a practical impossibility. Even if individual class members attested to when they played and their alleged gains and losses, Defendants will be entitled to investigate the attestation to determine whether it aligns with known facts about machine placement and class requirements. Class certification is inappropriate in such situations. *See Jenkins v. Pech*, 8:14CV41, 2015 WL 3658261, at *11 (D. Neb. June 12, 2015) (ascertainability requires a "process that does not require much, if any, individual factual inquiry").

Additionally, Plaintiffs' proposed class definition itself is illogical and will lead to administrative and individualized fact problems, as well as unfair results. For example, if a prospective class member played a Torch device on day 1, lost for the day, but on day 2 won more than was lost on day 1, that person would have no injury and should not be a class member. But according to Plaintiffs' analysis, this person would be a class member, and therefore, individualized issues specific to each potential class member would have to be litigated not only to allow Torch to claim a set-off but to determine class member status.

In short, Plaintiffs' proposed class is an abstraction that cannot be ascertained without requiring absent members to take action and, even then, would require individualized fact finding to evaluate class membership.

15

**C.** **The Class Action Device is Not Superior Because the Central Legal Issues about Missouri Gambling Laws Better Resolved Without Reference to a Class**

One of the 23(b)(3) requirements is that the class action device is "superior" to alternatives. In particular, courts must consider "the difficulties likely to be encountered in the management of a class action." Rule 23(b)(3)(D). "A consideration of these factors requires the court to focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001) (quoting 7AA Fed. Prac. & Proc. Civ. § 1780 (3d ed.)).

Here, there is a pending state law case to determine a central contested legal issue presented by Plaintiffs' Complaint, namely, whether Torch devices violate Missouri gambling laws. Resolving a contested question of state law through a Rule 23(b)(3) class action is clumsy at best. This issue can and will be resolved through the declaratory judgment process in the pending action in the Circuit Court of Cole County, *Torch Electronics, LLC, et al. v. The Mo. Dept. of Public Safety, et al.*, Case Number 21AC-CC00044, which is currently set for a bench trial at the end of July.[7] *See State of Minn. v. U.S. Steel Corp.*, 44 F.R.D. 559, 576 (D. Minn. 1968) ("The 'superiority' criteria of 23(b)(3) explicitly permits the court to look at the existence of other law suits when deciding whether a class action should be maintained."). Adjudicating what is essentially a matter of Missouri statutory interpretation is more efficiently handled in the already pending case in Missouri state court than in a federal forum. *See EQT Prod. Co. v. Adair*, 764 F.3d 347, 371 (4th Cir. 2014) (in conducting superiority analysis, "the court should consider how the dominance of state law issues may affect the suitability of this litigation in a federal forum").

---

[7] *See* **Exhibit H**, true and correct copy of the docket in Circuit Court of Cole County, Case No. 21AC-CC00044.

**D.    Commonality, Typicality, and Predominance are Not Satisfied Because of the Individualized Determinations Required by Plaintiffs' Claims**

Rule 23(b)(3) is an "adventuresome innovation . . . designed for situations in which class-action treatment is not as clearly called for." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (alterations omitted). Accordingly, courts are obligated "to take a close look at whether common questions predominate over individual ones." *Id*. (quotation marks omitted). In conducting this inquiry, courts "must undertake a 'rigorous analysis' that includes examination of what the parties would be required to prove at trial." *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1029 (8th Cir. 2010); *see also Dukes*, 564 U.S. at 352. Each of Plaintiffs' claims fails to satisfy these requirements because significant fact issues requiring individualized adjudication on a member-by-member basis will remain even after resolving Plaintiffs' claims.

**1.    RICO Claim**

Count I of Plaintiffs' Complaint seeks to recover the money Plaintiffs and the putative class spent playing Torch devices, along with other statutory civil RICO relief like treble damages and fees. Plaintiffs' theory is that Torch devices are illegal "slot machines" under Missouri law such that Torch's distribution of them violates a Missouri statute prohibiting the promotion of gambling. (*See* Compl., ¶ 111 (Doc. 1 at 31)). In turn, Plaintiffs allege this implicates RICO's prohibition on conducting an enterprise through a pattern of racketeering activity, and then allege that they were damaged by spending money playing the devices. (*See id*. at ¶¶ 112, 123, and 128 (Doc. #1 at 31-32, 34, and 35-36)).

As Torch explained in its partial Motion to Dismiss briefing, Plaintiffs lack statutory standing to bring their civil RICO claims. (*See* Doc. #29 at pp. 7-12; *see also* Doc. 50 at pp. 4-9). These problems are significantly compounded for Plaintiffs' civil RICO allegations on behalf of a

putative class. Under Eighth Circuit law, a class cannot be certified unless, as defined, **_each class member_** has standing. _See Halvorson v. Auto-Owners Ins. Co._, 718 F.3d 773, 778–79 (8th Cir. 2013) ("[A] class cannot be certified if it contains members who lack standing."); _see also Gallagher v. Magner_, 619 F.3d 823, 841–42 (8th Cir. 2010). Indeed, every Plaintiff deposed to this point has admitted they voluntarily chose to play Torch devices. (Section II, ¶ 21). Plaintiffs also admit there is no way to know what motivated a given individual to play a Torch device without asking each individual person. (Section II, ¶ 24). Some people simply enjoy playing games. (_Id._ at ¶ 22). In any event, for the reasons stated in Torch's Motion to Dismiss briefing (Docs. 29 at pp. 7-12 and 50 at pp. 4-9), Plaintiffs cannot state a viable civil RICO claim; they certainly should not be allowed to pursue such claims on behalf of a class. _See Poulos v. Caesars World, Inc._, 379 F.3d 654, 664–65 (9th Cir. 2004) (denying class certification of civil RICO claim in part "[d]ue to the unique nature of gambling transactions," which require a chain of inferences to determine why someone played the games they played); _see also Ruffu v. Johnson & Johnson, Inc._, 181 F.R.D. 341, 343 (E.D. Tex. 1998) (individual questions would predominate over class questions in civil RICO claim where reasons for purchasing product were at issue). And some, but not all, named Plaintiffs raise the issue of struggling with an alleged gambling addiction, an issue that is highly individualized and cuts against class certification. (_See_ Section II, ¶ 24); _see also Barnes v. Am. Tobacco Co._, 161 F.3d 127, 144 (3d Cir. 1998) (in tobacco case, where court determined causation required findings that class members were addicted to nicotine, certification was improper because addiction is a "highly individualistic inquiry").

### 2. MMPA Claim

To prove their MMPA claim in Count II, Plaintiffs must prove: (1) they purchased merchandise from Torch (2) for personal, family or household purposes and (3) suffered an ascertainable loss of money or property (4) as a result of an act declared unlawful under the MMPA.

*See Tucker v. Gen. Motors LLC*, 58 F.4th 392, 396–97 (8th Cir. 2023). Courts use "Missouri's long-standing 'benefit of the bargain'" rule to determine if the plaintiff has suffered ascertainable loss, which evaluates the difference in value between what was represented and what was received. *See Vitello v. Natrol, LLC*, 50 F.4th 689, 693 (8th Cir. 2022). Critically, "causation is a necessary element of an MMPA claim." *Owen v. Gen. Motors Corp.*, 533 F.3d 913, 922 (8th Cir. 2008). Here, certification is improper because resolution of Plaintiffs' claims would not provide an answer to the question of whether individual class members suffered an ascertainable loss caused by the alleged violations.

Plaintiffs allege they purchased "merchandise" under the MMPA by playing the machines.[8] (*See* Compl. ¶ 133 (Doc. 1 at 37)). To connect the alleged "purchases" with an unfair practice, Plaintiffs allege the "Net Payout %" of Torch's amusement devices is a "material fact" under the MMPA that a reasonable consumer would consider important when playing the games, but that the "Net Payout %" was below those established under Missouri Gaming Commission regulations. (*See id*. at ¶¶ 135-37, 138(b)-(d) (Doc. 1 at 37-39)). Plaintiffs allege Torch devices violate gambling laws, causing (somehow) "substantial injury to consumers." (*Id*. at ¶ 138(a) (Doc. 1 at 38)). Plaintiffs also allege the devices are visually enticing, "suggesting an exaggerated possibility of winning money," constituting a "deceptive format" under 15 CSR 60-9.030(1). (*See id*. at ¶ 138(e)). Plaintiffs allege their damages are the cash they inserted or, alternatively, the difference in money that they made and what they would have made if the "Net Payout %" was consistent with Missouri Gaming Commission regulations. (*See id*. at ¶ 139).

Plaintiffs present two theories of ascertainable loss. First, playing Torch devices caused

---

[8] Torch denies playing its devices equates to purchase of "merchandise" for purposes of the MMPA.

injury because the games were illegal. This essentially is the same as Plaintiffs' civil RICO claim; on its own, it fails to offer a theory of *how* Torch's machines caused the "injury," where the injury is merely money voluntarily spent playing games. *See Owen*, 533 F.3d at 922 (MMPA claims require causation between the alleged violation and ascertainable loss); *see also In re MasterCard Int'l Inc., Internet Gambling Litig.*, 132 F. Supp. 2d 468, 496 (E.D. La. 2001), *aff'd sub nom. In re MasterCard Int'l Inc.*, 313 F.3d 257 (5th Cir. 2002) ("Although plaintiffs cry out as victims in this case, they are in a precarious position because of their own voluntary acts of internet gambling. Plaintiffs' own acts of accessing the internet, locating the casinos, entering their information, and playing electronic casino games, are all intervening causes that break the chain of causation with respect to the defendants' alleged activities, even if they were illegal.").

Plaintiffs' second theory of ascertainable loss is that Torch devices are deceptive. Plaintiffs' two theories of deception both fail to provide a basis for certification. Plaintiffs' primary theory is that Missouri Gaming Commission regulations requiring a baseline "Net Payout %" for regulated casino "slot machines" should apply to Torch devices. However, the Missouri Gaming Commission's rulemaking authority is legislatively limited to regulating only riverboat casinos and, after June 30, 1994, the game of bingo at bingo halls. *See* RSMo. § 313.004.1 and .4. Torch devices are not found in any Missouri "excursion gambling boat[s]" nor do they allow users to play the game of bingo. Thus, this cannot be a basis for alleged deception. Further, each Plaintiff deposed testified they never saw or relied on any Torch advertisement or statements of alleged "Net Payout %" when playing Torch devices. (*See* Section II, ¶ 24).

Regardless, Plaintiffs' claim that the regulations governing electronic gaming devices on Missouri gambling boats ***should*** apply to Torch's devices does not answer whether any given class member suffered an ascertainable loss—which requires that they received something different than

promised. Critically, there is clearly no ascertainable loss for any class member who, like Plaintiff Cordaro, uses the "Prize Viewer" feature on a Torch device, and therefore, knows exactly their chances are of winning the next game. (Section II, ¶¶ 17, 23); *see also White v. Just Born, Inc.*, No. 2:17-CV-04025-NKL, 2018 WL 3748405, at *4 and 6 (W.D. Mo. Aug. 7, 2018) (denying certification and rejecting argument proposed class members were injured regardless of their state of mind; "consumers who knew how much empty space was in Just Born's candy boxes but purchased them anyway suffered no injury"; the "question of whether the slack-fill in Just Born's candy packaging violates the MMPA will be susceptible to a common answer . . . However, the question of whether any MMPA violation injured each class member will require individualized inquiry. . . . [I]f an individual knew how much slack-fill was in a candy box before he purchased it, he suffered no injury.") (citing *State ex rel. Coca-Cola Co. v. Nixon*, 249 S.W.3d 855, 862 (Mo. 2008) (consumers who continued to purchase Diet Coke despite knowing of allegedly misleading marketing "**suffered no injury**") (emphasis original)); *Hudock v. LG Elec. U.S.A., Inc.*, 12 F.4th 773 (8th Cir. 2021).

Plaintiffs' secondary deception theory (*i.e.*, the visual appeal exaggerates the probability of winning) fares even worse. The theory depends upon what each class member believed their implied chance of winning based on allegedly appealing visualizations and bright colors, a highly subjective and individualized inquiry. *See Poulos*, 379 F.3d at 668 ("[T]here may be no single, logical explanation for gambling . . . . The vast array of knowledge and expectations that players bring to the machines ensures that the 'value' of gambling differs greatly from player to player, with some people playing for 'entertainment value' or for any number of other reasons as much as to win. Consequently, we conclude that classwide circumstantial evidence would not suffice to prove causation in this case.").

Finally, the Court should decline to certify a state law MMPA class because the basis for federal jurisdiction (Plaintiffs' civil RICO claims) are not appropriate for certification. *See Ruffu v. Johnson & Johnson, Inc.*, 181 F.R.D. 341, 344 (E.D. Tex. 1998) (declining to certify a class on state law claims where the only federal claim was a civil RICO claim).

### 3. Mo. Rev. Stat. § 434.030 Claim

Plaintiffs' statutory "gambling losses" claim is ill-suited to class-wide treatment. This statute provides a cause of action to persons who lost money on gambling, but only if brought within a three-month window. For each claim, there are threshold legal issues concerning the viability of such claims, but the claims *overwhelmingly* turn on what losses occurred during a three-month period, which is a highly individualized issue. Plaintiffs propose no method of calculating such losses on a class-wide basis, much less a methodology that satisfies Rule 23(b)(3). *See Comcast*, 569 U.S. at 34 ("[R]espondents' model falls far short of establishing that damages are capable of measurement on a classwide basis. Without presenting another methodology, respondents cannot show Rule 23(b)(3) predominance . . .."). As Plaintiffs allege in their Complaint, "Torch owns and operates thousands of additional . . . machines at convenience stores, gas stations, bars, restaurants, and other places of public accommodation throughout Missouri." *See* Compl., ¶ 35 (Doc. #1 at 6). A certified class for this claim would turn into an enormous administrative quagmire. Most of the named Plaintiffs themselves cannot provide admissible evidence of their alleged wins and losses. (*See* Section II, ¶¶ 18-19, 26-28). Plaintiffs fail to explain how ascertaining such information for absent class members can be accomplished.

### E. Plaintiffs Lack Evidence to Support Class Certification

Plaintiffs filed their Motion for Class Certification before any Defendant has had an opportunity to file an Answer. Defendants have filed multiple Motion to Dismiss various claims. Consequently, it is unclear at this point what claims Defendants will need to defend. Plaintiffs also

have yet to identify any expert witness to offer potential opinions regarding class notice, administration, alleged methodologies for ascertaining class-wide damages, or how Torch devices are allegedly illegal or deceptive. This, standing alone, should be fatal to Plaintiffs' class certification request. *See Prantil v. Arkema Inc.*, 986 F.3d 570 (5th Cir. 2021) (vacating class certification because district court failed to analyze "the considerations affecting the administration of trial" and instructing district courts to "detail[] the evidence the parties may use to prove or defend against liability and its commonality to all class members"); *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587 (7th Cir. 2021) (district court abused its discretion in certifying a class because, in part, it improperly relied on plaintiffs' offered expert testimony supporting class certification before "ensur[ing] that [the expert opinions] lived up to the standard of *Daubert* and Rule 702"). "An assessment of the reliability of Plaintiffs' scientific [or expert] evidence for certification cannot be deferred." *Prantil*, 986 F.3d at 576. Aside from a few affidavits from Plaintiffs and their counsel containing formulaic and largely conclusory statement, Plaintiffs offer essentially no evidentiary support for their request to have the Court certify an amorphic and unascertainable class action. Plaintiffs' have not and cannot demonstrate certification under Rule 23 is proper.

## V.    Conclusion

For the foregoing reasons, Torch respectfully requests the Court deny Plaintiffs' Motion for Class Certification (Doc. 30), and further request the Court grant any additional and further relief the Court deems just and proper.

Dated:  July 14, 2023                              Respectfully submitted,

                                                                     GRAVES GARRETT LLC

                                                                     By:   /s/ J. Aaron Craig
                                                                             Todd P. Graves #41319 (MO)
                                                                             J. Aaron Craig #62041 (MO)
                                                                             1100 Main Street, Suite 2700
                                                                             Kansas City, MO 64105

Phone: (816) 256-3181
Fax: (816) 256-5958
tgraves@gravesgarrett.com
acraig@gravesgarrett.com

**Attorneys for Defendants Torch Electronics,
LLC, Steven Miltenberger, and Warrenton
Oil Company**

## CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

 /s/  J. Aaron Craig
Attorneys for Defendants Torch
Electronics, LLC, Steven Miltenberger, and
Warrenton Oil Company

24