

# PohlmanUSA
## Court Reporting and Litigation Services

Mary Bolden

June 20, 2023

Patrick Romano, et al.

vs.

Torch Electronics, LLC, et al.

1  Q. Do you recall approximately what time of day
2  it was?
3  A. I do not.
4  Q. It could have been morning, afternoon,
5  evening. You have no idea?
6  A. No -- I mean, no, I have no idea. Because I
7  go any time of the day depending on what I'm doing.
8  Q. When you first saw this device that you
9  played, did you review any kind of documents or
10 statements, even on the machine itself, that Torch put
11 out about how these devices work or what you can
12 expect to do as a player?
13 A. No.
14 Q. So, is it fair to say that you didn't rely
15 on anything Torch said when you decided to play the
16 Torch device?
17 A. Repeat that.
18 Q. Sure. You didn't rely on anything Torch
19 said when you choose to play the Torch device.
20 A. No, I just thought it was a slot machine.
21 Q. And similarly, every time you've played
22 Torch devices since then, the same is true, correct?
23 You didn't rely on anything Torch said?
24 A. No.
25 Q. Meaning that's accurate?

14

1  A. Yeah.
2  Q. Okay. Ms. Bolden, when you played this
3  Torch device the first time, how much money did you
4  play?
5  A. About 60 bucks.
6  Q. And what do you recall playing, as far as
7  the game or the nature of the game?
8  A. You're saying what's on it like?
9  Q. Yes. What do you recall about the game
10 itself? Do you recall anything about graphics or
11 sounds or pictures?
12 A. Yeah. I just thought, you know --
13 Q. Themes?
14 A. Thought that it was just a regular slot
15 machine that it just, you know, I didn't know that it
16 couldn't -- you can only -- you can't cash out certain
17 things.
18    And I just thought it was just like a
19 regular slot machine like. The features that, you
20 know, animals, whatever, whatever -- I mean, it
21 just -- it really didn't matter what was on it, like,
22 you know, I just -- I was looking for the payout.
23 Q. How do you know it was a Torch device?
24 A. I did not know it was a Torch device. My
25 lawyer -- you know, once my lawyer told me it was a

15

1  Torch device.
2  Q. To this day, do you know if you've ever
3  actually played a Torch device?
4  A. Yes.
5  Q. How do you know that you've played Torch
6  devices?
7  A. My lawyers.
8  Q. So, the only basis on which you're
9  testifying you played a Torch device is your lawyer
10 told you it was a Torch device?
11 A. Yes. I don't know what they -- who owns
12 what. So. I rely on my lawyers to find that out.
13 Q. How many times have you played Torch
14 devices?
15 A. Over a hundred times.
16 Q. Where do you play?
17    Let me rephrase that.
18    Where have you played?
19 A. I've played at Wellston Market, BP,
20 petroleum. I don't know exactly. It's the Phillips
21 66 on Natural Bridge and Jennings Station Road.
22 Q. Do you know Mohammed Almuttan?
23 A. I do not.
24 Q. To the best of your knowledge, have you ever
25 communicated in any way, shape, or form with Mohammed

16

1  Almuttan?
2  A. Not to my knowledge.
3  Q. If Mohammed Almuttan were sitting in this
4  room today, would you know if he was here?
5  A. No.
6  Q. Have you ever interacted with a company
7  called Mally, Inc.?
8  A. Not to my knowledge.
9  Q. Have you ever been to a store called Mally's
10 Supermarket?
11 A. Yes, I have.
12 Q. When have you been to Mally's Supermarket?
13 A. I go there frequently.
14 Q. What do you do at Mally's Supermarket?
15 A. Shop.
16 Q. What do you buy?
17 A. Groceries.
18 Q. Is it fair to say that when you go to
19 Mally's Supermarket you go there just to shop for
20 groceries?
21 A. Basically, because of the -- the high crime
22 there. I don't want to play slots there because of
23 the activities that goes on there.
24 Q. So, to be clear, you're testifying that you
25 have not played any Torch devices, if there are any,

17

5 (Pages 14 to 17)

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:23-cv-04043-BCW   Document 72-1   Filed 07/14/23   Page 2 of 8

**Page 18**

1  at Mally's Supermarket?
2      A.  No.
3      Q.  Meaning that's correct?
4      A.  Correct.
5      Q.  Okay.  So, when you go to Mally's
6  Supermarket, it's just to buy groceries, those kinds
7  of things, correct?
8      A.  Yes.
9      Q.  Okay.  When you go to Mally's Supermarket
10 and pay for things like groceries, how do you pay for
11 them?
12     A.  Cash.
13     Q.  Do you use credit cards or debit cards or
14 anything like that?
15     A.  No.
16     Q.  How frequently do you go to Mally's
17 Supermarket?
18     A.  Frequently.
19     Q.  Every week or every two weeks?
20     A.  Maybe two.
21     Q.  Okay.  Do you live near Mally's Supermarket?
22     A.  I do.
23     Q.  Is that why you go there?
24     A.  Yes.
25     Q.  Is it fair to say it's a convenient place

**Page 19**

1  within the neighborhood to buy groceries?
2      A.  If you -- yeah, if you just need something
3  right then.
4      Q.  There's not a lot of similar stores near
5  there, correct?
6      A.  It is in my neighborhood.  There's more
7  stores there, but...
8      Q.  Okay.  You testified that you don't know
9  Mohammed Almuttan.
10         Are you claiming to have been injured or
11 damaged in any way, shape, or form in connection with
12 this lawsuit by Mohammed Almuttan individually?
13     A.  Individually?
14     Q.  Yes.
15     A.  I -- I admit I don't know him.  But I've
16 read that he's in the lawsuit.  I don't know him
17 personally.
18     Q.  Why did you sue Mohammed Almuttan?
19     A.  Because of the devices.  The -- because of
20 the slot machines that are in the -- my local stores.
21     Q.  What is your understanding -- what are you
22 claiming Mohammed Almuttan has to do with what you
23 call the slot machines in your local stores?
24     A.  I'm not sure his position as far as
25 ownership or any of that.  But I just think that if

**Page 20**

1  the machines are illegal, then it affects me.
2      Q.  And just to be clear, why did you sue Mally,
3  Inc.?
4      A.  They are included in the lawsuit as well.
5      Q.  Yeah.  I'm asking why.
6      A.  I don't know their -- their actual
7  connection with ownership or whatever, but he's
8  included -- it's included in the lawsuit.  So I feel
9  the same way about Mally's as well.
10     Q.  Are you claiming to have been injured or
11 damaged in any way, shape, or form by Mally, Inc.?
12     A.  Yes.
13     Q.  How?
14     A.  Because of the slot machines.
15     Q.  Which you've testified under oath today
16 you've never played at Mally, Inc.
17     A.  Well, I -- he's -- I don't know his
18 position.  Like I said, I don't know his position as
19 far as where he fall in at in line as a -- I mean, as
20 a -- an ownership with Torch.  That's who I'm -- you
21 know.
22     Q.  So let's break that down for a second,
23 please.
24     A.  Uh-huh.
25     Q.  Is it your understanding that Mohammed

**Page 21**

1  Almuttan is named in this lawsuit because he has an
2  ownership interest of Torch?
3      A.  I'm not exactly sure if he's the ownership
4  of it or -- or he -- I -- I don't know his exact --
5  what exactly his position as far as Torch.  So, he's
6  listed in -- in the lawsuit, so I -- I'm assuming he's
7  a part of Torch in some type of way.
8      Q.  Without assuming anything, because I just
9  want you to testify to what you know and what you
10 don't know.  And if you don't know, and that's an
11 honest answer, that's a fine answer.
12         What I want to ask you is this:  Sitting
13 here today, are you claiming that Mohammed Almuttan or
14 Mally's Supermarket caused you any injury or damages
15 in any way, shape, or form that you know about?
16     A.  I'm not sure.
17     Q.  So, is it fair to say that if, in fact, they
18 did, you can't tell us how or what sitting here today,
19 correct?
20     A.  Not if I don't know their position.
21     Q.  In terms of Torch?
22     A.  Torch.  If they're connected with Torch.
23     Q.  Meaning if they have an ownership interest
24 in Torch?  I'm trying to understand what you're
25 saying.

6 (Pages 18 to 21)

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com

**Page 22**

1  A. Yeah.
2  Q. Okay. How did you first become involved in
3  this lawsuit?
4  A. I was speaking with a lawyer about some
5  tickets and just jokingly with him about the -- him --
6  me giving him my casino money or my, you know, my slot
7  money.
8    And he said how often do you play, and do
9  you play here. And he said I can refer you to
10 somebody. And that's when he referred me to a lawyer.
11 Q. Was that Mr. Lemp?
12 A. Yes.
13 Q. So, was the idea of filing this lawsuit --
14 let me rephrase that.
15   Was the idea of referring you to talk to a
16 lawyer about this lawsuit your idea or Mr. Lemp's
17 idea?
18 A. Well, both, really.
19 Q. Did you go talk to Mr. Lemp to say I've been
20 playing Torch devices, and I want to file a lawsuit?
21 A. I did not.
22 Q. Mr. Lemp was the one that brought that up,
23 correct?
24 A. Yes.
25 Q. And then Mr. Lemp referred you to the

**Page 23**

1  lawyers that are representing you in this case.
2  A. Yes.
3  Q. With respect to this particular lawsuit, I'm
4  going to show you what we've previously marked as
5  Exhibit 1.
6    (Exhibit 1 was identified.)
7  A. Uh-huh.
8  Q (By Attorney Gelfand) Do you have Exhibit 1
9  in front of you, ma'am?
10 A. I do.
11 Q. Do you recognize Exhibit 1?
12 A. I do.
13 Q. Is Exhibit 1 a copy of the Complaint that
14 you're named as a Plaintiff in, in this case?
15 A. Say that again.
16 Q. Sure. Is Exhibit 1 a copy of the Complaint
17 that you're named as a Plaintiff in, in this case?
18 A. Yes.
19 Q. Okay. When's the first time you saw
20 Exhibit 1?
21 A. I don't know the exact date.
22 Q. To this day, have you ever reviewed
23 Exhibit 1 in its entirety?
24 A. I have.
25 Q. Did you review it prior to it being filed?

**Page 24**

1  A. Yes.
2  Q. And approximately when was that?
3  A. I can't give you the exact date. I'm sure
4  it's on file. My lawyers probably -- the exact -- I
5  don't -- I cannot think. February maybe. I'm not
6  sure exactly.
7  Q. Of 2023?
8  A. Yeah.
9  Q. Okay. Based on your review of Exhibit 1,
10 and in particular the facts, as opposed to the law
11 that's stated, is everything in there true?
12 A. Best of my knowledge. As far as what I --
13 what I can understand.
14 Q. Okay. I'm going to show you -- before I get
15 there for a second.
16   Do you know any of these other Plaintiffs
17 that are listed there in addition to your name as
18 Plaintiff?
19 A. I do.
20 Q. Who do you know?
21 A. Monica McGee.
22 Q. How do you know Monica McGee?
23 A. We work together.
24 Q. Where do you work with Monica McGee?
25 A. Air Products & Chemicals.

**Page 25**

1  Q. How long have you known Ms. McGee?
2  A. Well, nine years. Since I got -- since I --
3  when I started there.
4  Q. Did you bring her into this lawsuit?
5  A. No. We were actually together, both
6  laughing, taking care of some business with Mr. Lemp.
7  Q. You and Monica McGee went to Mr. Lemp
8  together?
9  A. Yeah. We was taking care of some tickets
10 for our kids.
11 Q. For your kids?
12 A. Uh-huh.
13 Q. Okay. And when was that meeting with
14 Mr. Lemp?
15 A. I don't know. I can't recall.
16 Q. Approximately? When was it in relation to
17 when the lawsuit was filed?
18 A. It's been months. I guess maybe February or
19 so. I'm not quite sure exact -- the exact date.
20 Q. Did Ms. McGee, in your presence, bring up
21 the idea that she wanted to sue any of the Defendants
22 named in this lawsuit?
23 A. No. We were just laugh- -- like I said, we
24 were just laughing and joking about paying him. And,
25 you know, about -- you know, like I told you, the

**Page 26**

1 casino money, and da-da-da, and then that's -- this
2 all just happened.
3    Q. And just to be clear, when you were joking
4 about paying Mr. Lemp, meaning for your kids' tickets?
5    A. For the tickets. Yeah.
6    Q. For his legal fees?
7    A. Yeah.
8    Q. And you were joking about paying him with
9 gambling proceeds?
10    A. With all the casino money.
11    Q. Okay. Were you talking about Torch money
12 too?
13    A. I mean, if -- it's gambling money, put it
14 that way.
15    Q. So, were you talking about Torch money?
16    A. I mean, if Torch -- Torch probably got some
17 too. We just say casino. We don't say Torch money.
18 It's gambling. So, we don't just say -- it's casino
19 all to me. So.
20    Q. And is that how you paid Mr. Lemp?
21    A. I paid him with some of my cash from my ATM
22 fee -- from my ATM.
23    Q. When you played Torch devices, were there
24 times where you pushed the button and you won money?
25    A. Maybe $5 or something. I've never -- like I

**Page 27**

1 couldn't -- I don't consider it winning because --
2    Q. Just answer my question, please, if you
3 would. And if you don't understand it, I'll rephrase
4 it.
5      When you played these devices, you push a
6 button and then the game plays, correct?
7    A. Uh-huh. And I won a few dollars, yeah.
8    Q. Okay. So, is it fair to say that sometimes
9 when you play the device you've won, sometimes you've
10 lost?
11    A. No, I'm not gonna say that.
12    Q. Let's break this down for a second. Are
13 there times when you push the button and you won?
14    A. Uh-huh.
15    Q. "Yes?"
16    A. Yeah.
17    Q. And I'm not trying to be rude. The court
18 reporter has to take down "yes's" or "no's" for the
19 record.
20    A. I understand what you're saying.
21      Sometimes it gives me five. But then it
22 takes ten. I get what you're saying.
23    Q. Meaning on the next turn?
24    A. Yeah.
25    Q. Are there sessions, meaning if you sat down

**Page 28**

1 and played -- and I'm making this up -- for
2 half-an-hour at a time, are there sessions where you
3 ended up with more money than you started with?
4    A. No.
5    Q. So help me understand this. Why do you keep
6 playing these devices every single week if you don't
7 make any money ever?
8    A. Because that's what I like to do.
9    Q. Because it's entertainment?
10    A. Uh --
11    Q. You enjoy it?
12    A. Some people call it that.
13    Q. Some people play for entertainment, correct?
14 Some people play for entertainment, correct?
15    A. Yeah.
16    Q. Is it fair to say that you played this
17 device, when you play it, for your own reasons, other
18 people play for different reasons?
19    A. I can't -- yeah. I can't speak for those
20 people. I can speak for me.
21    Q. Sure. And the reason you can't speak for
22 those people is cause we would have to talk to each of
23 them individually to figure out why they play the
24 device, correct?
25    A. Right. I play to win money.

**Page 29**

1    Q. Okay. And some people might play for
2 different reasons, correct?
3    A. Maybe. I'm sure.
4    Q. You might play for 20 minutes, they might
5 play for one minute, correct?
6    A. Absolutely.
7    Q. You might win, they might lose, and vice
8 versa, correct?
9    A. Absolutely.
10    Q. You might rely on -- you testified you don't
11 rely on what Torch says about how these devices work,
12 but other people may, correct?
13    A. Yes.
14    Q. This would all require an individualized
15 inquiry from every single one of these Torch players.
16 You're not here to tell us something on behalf of all
17 of them, correct? You can only testify for yourself,
18 correct?
19    A. Sure.
20    Q. Now, Ms. Bolden, when you played these Torch
21 devices, are you claiming that any of the devices were
22 rigged?
23    A. I think so.
24    Q. Why do you think that?
25    A. Because it doesn't -- it doesn't payout.

```
 1   that's true or not true?
 2       A.  That's not -- I -- that's not my position.
 3   I don't -- that -- that's -- that's for my lawyers to
 4   do.  Whatever is in that packet that I read, I'm
 5   relying on that.  It is --
 6       Q.  What are you hoping to get out of this
 7   lawsuit?
 8       A.  Well, I would like the Torch machines to be
 9   removed from my neighborhood because it's affecting my
10   neighborhood, my elderly people.  And -- and to
11   recover some of my losses.
12       Q.  Are you hoping to get more because you are
13   asking to be permitted to serve as a class
14   representative in this lawsuit?
15       A.  No.
16       Q.  Has it been suggested to you by anyone that
17   you could get more -- and I'm not saying illegally,
18   I'm saying legally -- with, you know, various -- with
19   court approval by serving as a class representative?
20       A.  No.
21       Q.  You said your -- your primary goal, if I
22   heard you correctly, but correct me if I'm wrong, is
23   that you want these devices off the street, so to
24   speak --
25       A.  Yeah --
                                                      38
```

```
 1       Q.  -- is that correct?
 2       A.  -- be removed.
 3       Q.  Would you agree with me that some Torch
 4   users don't share that goal?
 5       A.  Maybe.
 6       Q.  Some Torch users want more Torch devices,
 7   correct?
 8       A.  Maybe.  You asked me about my opinions.
 9       Q.  I understand.  And some Torch users want
10   less Torch devices, correct?
11       A.  (Nod of head.)
12       Q.  Some Torch users want the exact same amount
13   of Torch devices that exist right now, correct?
14       A.  Maybe, yeah.
15       Q.  Is it fair to say that your goals, which I
16   understand, differ from the goals of all Torch users?
17           In other words, some may agree with you,
18   some may disagree with you?
19       A.  Yes.
20       Q.  And you're not claiming to be kind of a
21   typical Torch user.  You may be typical, you may be
22   atypical, you don't know.  Correct?
23       A.  No.  I feel I'm typical.
24       Q.  Why are you typical?
25       A.  I'm -- I'm different from -- of course,
                                                      39
```

```
 1   right.  I'm a typical player.  This is what I -- I do
 2   it -- I mean, you know, I'm -- I'm -- I'm just
 3   typical.  I just -- I don't know how to explain that
 4   to you.
 5       Q.  Have you ever been diagnosed with having a
 6   gambling addiction?
 7       A.  No.
 8       Q.  Do you consider yourself as someone who has
 9   a gambling addiction?
10       A.  No.
11       Q.  Okay.  Is it fair to say that every time you
12   play Torch devices you do it voluntarily?
13       A.  I do.
14       Q.  In other words, no one forces you to play
15   them?  No one is holding a gun to your head.
16       A.  No.
17       Q.  Okay.  And every time that you've played
18   Torch devices voluntarily, you don't believe that you
19   have an addiction, correct, a gambling addiction?
20       A.  I wouldn't call it an addiction.
21       Q.  Okay.  Would you agree with me that some
22   Torch users may consider themselves to have an
23   addiction or may have been diagnosed with an
24   addiction?
25       A.  Maybe.
                                                      40
```

```
 1       Q.  That would require an individualized mental
 2   health inquiry of every one of those people, correct?
 3       A.  I'm not sure.
 4       Q.  In other words, you'd have to talk to their
 5   psychiatrist or doctor to determine whether they
 6   actually have an addiction to answer that question,
 7   correct?
 8       A.  I'm assuming if -- you know, it has to be
 9   diagnosed if they have -- I guess.  I don't know.  I
10   mean, you know, I just -- I mean, I don't -- I don't
11   consider myself as an addict, but I do like to play.
12       Q.  Tell me everything that Ms. McGee has told
13   you about this lawsuit.
14       A.  She hasn't told me anything.  We -- I mean,
15   anything like -- she hasn't told me anything about it.
16   We -- I mean, we were there.  And we laughed about,
17   you know --
18       Q.  Has she told you what she hopes to get out
19   of this lawsuit?
20       A.  No.  We just laugh.  We -- like we didn't
21   know that these machines were illegal.  Like really
22   like --
23       Q.  Do you know that they're illegal?
24       A.  I do now.
25       Q.  Based on what?
                                                      41
```

**Page 50**

1  Q. Ms. Bolden, have you ever held any
2  certifications or licensures, like from any state
3  agency or governmental agency?
4  A. Any who?
5  Q. Certifications or licensures?
6  A. No.
7  Q. You testified that you gamble fairly
8  consistently in terms of casinos and things like that,
9  correct?
10 A. Correct.
11 Q. Do you report your -- well, not do you.
12    Have you reported your gambling winnings or
13 losses on your federal or state income tax returns?
14 A. I have.
15 Q. Every year?
16 A. No.
17 Q. What years have you reported them?
18 A. 2022 and '21, '21 and '22.
19 Q. Have you included any winnings or losses
20 from Torch devices?
21 A. No. I don't even know how to get those
22 losses or wins.
23 Q. Why have you not reported winnings or losses
24 on tax returns in previous tax years, like 2020 and
25 2019, 2018?

**Page 51**

1  A. I -- I mean, I don't know if why I -- okay.
2  Twenty -- 2020 -- what was it? 2021 and '22.
3     So, the previous years, I'm not sure if I
4  had enough losses or whatever to, you know -- but I
5  don't recall.
6  Q. Have you timely filed all of your tax
7  returns in the last six years?
8  A. Oh, yes.
9  Q. How much in total are you claiming to have
10 won or lost in gambling, for example, in 2022?
11 A. From casinos?
12 Q. From total gambling.
13 A. I'm not sure the accurate number for that.
14 Q. How about from casinos?
15 A. I don't have accurate numbers. Are you
16 saying -- you said total overall Torch and casinos?
17 Q. How about just casinos?
18 A. I don't know the numbers of them.
19 Q. How about just casinos?
20 A. I'm not sure. I don't have an accurate
21 number. So, you know.
22 Q. Is the number on your tax return an accurate
23 number?
24 A. Yes, it would be on the tax return.
25 Q. Ms. Bolden, I'm going to show you what's

**Page 52**

1  been previously marked as Exhibit 5 for purposes of
2  this deposition.
3     (Exhibit 5 was identified.)
4  Q. (By Attorney Gelfand) Do you see what is
5  identified as Document 35 entitled "Plaintiffs
6  Opposition to Partial Motion to Dismiss" filed by your
7  attorneys in this case?
8  A. Yes.
9  Q. Have you ever seen this document?
10 A. Yes.
11 Q. When did you first see this document?
12 A. I don't have the exact date.
13 Q. Approximately when did you see this
14 document?
15 A. I'm not sure was it in February or not. I'm
16 not good with the date dates.
17 Q. I'm not trying to trick you, but just to
18 understand your testimony. This was filed with the
19 court on May 12th of 2023.
20 A. I don't know --
21 Q. Are you sure you've actually seen this
22 document?
23 A. Pardon me?
24 Q. Are you sure you've actually seen this
25 document?

**Page 53**

1  A. Yeah, I've seen it.
2  Q. Okay. I want to show you starting on the
3  bottom of page 12.
4  A. Uh-huh.
5  Q. Do you see where it says -- and tell me if
6  I'm reading this correctly -- that your lawyers wrote:
7  Except as permitted in a constitutionally authorized
8  casino, gambling is a criminal offense.
9     Did I read that correctly?
10 A. Uh-huh.
11 Q. "Yes?"
12 A. Yes.
13 Q. Quote: A person commits the offense of
14 gambling if he or she knowingly engages in gambling.
15 End quote.
16    And then it cites Section 572.020 of the
17 Revised Statutes of the state of Missouri.
18    Did I read that correctly?
19 A. Yes.
20 Q. And then it says: Yes, consumers -- meaning
21 the Plaintiffs, including you, in this lawsuit, were
22 gambling.
23    Did I read that correctly?
24 A. Yes.
25 Q. Is it your testimony, consistent with what

14 (Pages 50 to 53)

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:23-cv-04043-BCW   Document 72-1   Filed 07/14/23   Page 7 of 8

**Page 54**

1 your lawyers wrote in this lawsuit, that you committed
2 the crime of gambling when playing Torch devices?
3    A.  Yes.
4        ATTORNEY GELFAND:  I'm going to take a brief
5 break for one second and go off the record, if I can.
6 And then I don't believe -- if I have anymore
7 questions, it's just a handful.
8        VIDEOGRAPHER:  Okay.  Let's go off -- off
9 the record at 10:54.
10           (Recess.)
11       VIDEOGRAPHER:  We are back on the record at
12 11:04.
13       ATTORNEY GELFAND:  Elizabeth, are you good
14 to go?
15       COURT REPORTER:  Yes.
16       ATTORNEY GELFAND:  Perfect.  At this point
17 in the deposition I don't have any further questions
18 for you now.  I may have a few follow-up questions for
19 you later.
20       But Mr. Craig, you're up.
21       ATTORNEY CRAIG:  All right.
22          [CROSS-EXAMINATION]
23    QUESTIONS BY ATTORNEY CRAIG:
24    Q.  Ms. Bolden, hi.  My name is Aaron Craig, and
25 I'm an attorney on behalf of Torch Electronics, Steven

**Page 55**

1 Miltenberger, and Warrenton Oil.  You may -- I may
2 repeat some questions.  I apologize.  But bear with
3 me.  Okay?
4        What's your highest level of education?
5    A.  Twelfth grade.
6    Q.  What's that?
7    A.  Twelfth.
8    Q.  Okay.  You have -- you don't have any
9 certifications or anything like that?  Any time at a
10 college or junior college, anything like that, after
11 high school?
12    A.  No.  I don't have any credits or anything.
13 I went to Forest Park Community College, but I didn't
14 get any credits for it.  I dropped out.
15    Q.  Now, you testified that in the last -- or
16 '21 and '22, I think, tax reports, you listed wins or
17 losses related to -- to gambling.
18        Do you recall were those wins or were those
19 losses for those years?
20    A.  The losses for 2021 and '22.
21    Q.  They were both losses?
22    A.  Yes.
23    Q.  Do you -- do you recall just generally like
24 a ballpark number for losses in 2021?
25    A.  I do not.

**Page 56**

1    Q.  You -- do you remember if it was, say, less
2 than $10,000, more than $10,000?
3    A.  I -- I can't.  I don't want to -- I can't
4 say that.  So, I'm not sure.  I'm not a hundred
5 percent sure.  So, I don't want to say --
6    Q.  Okay.
7    A.  -- you know, 10 or 20 and I'm not accurate.
8    Q.  And then for 2022, that -- that was a loss,
9 correct?
10   A.  Yes.
11   Q.  And do you have a ballpark number for the
12 amount of the gambling-related losses for 2022?
13   A.  I do not.
14   Q.  And again, wouldn't -- you wouldn't be
15 certain whether or not it was more than 10,000 or less
16 than 10,000 for 2022?
17   A.  I don't have that ballpark.
18   Q.  And then, as far as -- well, let me back up.
19       I believe you testified that you aren't sure
20 whether or not any of the dev- -- devices that you
21 played are, in fact, Torch devices, correct?
22   A.  Am I sure now?
23   Q.  Yes.
24   A.  According to my lawyer, yes.
25   Q.  Okay.  But there -- other than your lawyer's

**Page 57**

1 statements to you that the machines that you played
2 were Torch devices, do you have any other way of
3 verifying one way or the other that the devices that
4 you played were, in fact, Torch devices?
5    A.  No, I do not.
6    Q.  And are you aware that other distributors or
7 manufacturers placed similar-looking devices in
8 convenience locations throughout the state of Missouri
9 in addition to Torch?
10   A.  Could you say that again?
11   Q.  Yeah.  Are you aware that Torch isn't the
12 only company that puts those types, similar looking
13 devices in real -- in retail locations in the state of
14 Missouri?
15   A.  No, I -- I don't know.  I just know about
16 Torch.
17   Q.  Okay.
18   A.  I don't know anything about any other
19 distributors or anything.
20   Q.  Did you ever see any labeling on any of the
21 devices that you used that led you to believe one way
22 or another that they were Torch devices?
23   A.  No.
24   Q.  If you look at your Declaration, which I
25 believe is Exhibit 8.  Yeah.  You listed Wellston Food