

# PohlmanUSA
## Court Reporting and Litigation Services

Jeffrey Cordaro

June 19, 2023

Patrick Romano, et al.

vs.

Torch Electronics, LLC, et al.

```
 1      A.  Information.
 2      Q.  When was the first one?
 3      A.  '97.
 4      Q.  That was in 1997?
 5      A.  Right.  And then I was giving you the -- I
 6  had to do two-day shock time in 1997.  I didn't get
 7  convicted.  I mean, that one wasn't -- the other one
 8  in 2002, when they gave me a six-month suspended
 9  sentence, two years' probation, and --
10      Q.  Fourteen-day shock time?
11      A.  Shock time.
12      Q.  And so, to be clear, were they both in
13  St. Charles County?
14      A.  Yes.  One was the City of St. Charles, and I
15  think the other one was St. Charles County Sheriff.
16      Q.  Any other run-ins with the law?
17      A.  Uh.  Probably got another alcohol-related
18  offense back in like '80s.  But nothing transpired out
19  of that.  I never got any record of it or anything,
20  you know.
21          I had to go to a weekend -- what amounts to
22  a SATOP class now, but you stayed in a hotel.
23          And I -- I went and looked for that.  I
24  don't have any record of that.  The DWI was driving
25  under the influence.  So, I have things on the
                                                    14
```

```
 1  driver's side that are there.
 2      Q.  Any non-driving-related criminal
 3  convictions?
 4      A.  No.
 5      Q.  Have you ever been diagnosed with any sort
 6  of addiction-based illnesses or mental health diseases
 7  by a medical professional?
 8      A.  Yes.
 9      Q.  What have you been diagnosed with?
10      A.  Let's see.  Well, when I was diagnosed, they
11  still called it manic depression.  Now it's called
12  bipolar.
13          I have bipolar too.  I always knew I was
14  addicted to alcohol, I just didn't want to face it.
15  That last DWI, November 19, 2002, last time I took a
16  drink.  So, I went 20-and-a-half years without one.
17          But I have an addictive personality.  Yeah,
18  did a lot of drugs when I was younger and stuff.  And
19  I did -- I gave that up.
20          And that woman I was talking about
21  Ernestine, she liked to gamble.  So, two Gypsies liked
22  to go gamble.  So.
23          I have an addictive personality, and I
24  definitely have had addictions.  And I have one now.
25  It's called gambling.
                                                    15
```

```
 1      Q.  Who diagnosed you first with what you
 2  consider a gambling addiction?
 3      A.  I was first diagnosed with bipolar by Dr.
 4  Jose Fisher.  I've had -- I've been inflicted with
 5  that for 40-plus years.  I was 22.
 6      Q.  When were you first diagnosed with a
 7  gambling addiction?  I'm not talking about bipolar.
 8      A.  I did not go to a certified rehab for that.
 9  I was seeking, you know, mental health care from a
10  bevy of different people because I had different
11  health plans.  When I didn't have a health plan, I
12  went to, like, free clinics, you know.  Some of the
13  people I saw might not have been psychiatrists but
14  they were psychologists.  And then they got the okay
15  to write the prescriptions from the psychiatrist.
16          More than one person --
17      Q.  Have you ever received --
18      A.  -- told me that I had a gambling addiction.
19      Q.  Have you ever received a prescription or
20  some sort of formal treatment for a gambling
21  addiction?
22      A.  Not -- not a formal treatment.  I've never
23  taken any -- any, you know, prescription drugs for any
24  gambling.
25      Q.  How did you first become involved in this
                                                    16
```

```
 1  class -- proposed class action lawsuit filed in
 2  Federal court?
 3      A.  By happenstance.  I have a friend of mine,
 4  and I was helping her clean out storage and finished.
 5  And she got a phone call.  Closed up the thing.  She
 6  got in the car.
 7          I got a little car.  And she's talking to
 8  her lawyer about her own legalese stuff.  And then,
 9  from real close, I heard the word "gambling."  And
10  then I asked.  So, she goes, no, not really.  But my
11  friend is.  And that was me sitting next to her.  She
12  knew that, you know.  I was very honest with her that
13  I'm a degenerate gambler.
14      Q.  Who is your friend?
15      A.  Her name is Jamie Seel, S-e-e-l.  She
16  happens to be a client of Karl Lemp, with a "K."
17      Q.  So, Mr. -- your understanding from what you
18  observed was Mr. Lemp and Ms. Seel were having a phone
19  conversation?
20      A.  Correct.
21      Q.  And this was in your presence?
22      A.  Correct.
23      Q.  And Mr. Lemp was asking Ms. Seel if she was
24  involved -- she wanted to be involved in this lawsuit,
25  and she said, no, but my friend does?
                                                    17
```

5 (Pages 14 to 17)

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:23-cv-04043-BCW   Document 72-2   Filed 07/14/23   Page 2 of 9

Page 18:

1  A. Well, nothing about a lawsuit. That I --
2  you know, at the beginning. She said just, you know,
3  I -- I didn't hear exactly what he was saying. It was
4  garbled sort of like Charlie Brown,
5  wwwrrrbbbblllluuuubb, you know, when the parents talk.
6      But then, for some reason, she pulled the
7  phone away, and I heard the word "gambling."
8      And then the next reaction, she goes, well,
9  no, not really. And then she's like, well, he does,
10 my friend does. Because I was right there.
11 Q. So, did she hand you the phone?
12 A. He asked her another couple of questions,
13 and she asked me. And then he asked her, is it okay
14 if, you know, I talk to him. And she handed me the
15 phone, and I just started talking to him.
16 Q. Just to be clear, you did not reach out to
17 an attorney for what you believed was a legal problem
18 or question. The attorney was talking to Ms. Seel and
19 then the attorney said to Ms. Seel, can I please speak
20 with you? Ms. Seel said that. Is that accurate?
21 A. That's exactly right.
22 Q. What do you want out of this lawsuit?
23 A. To get them games out of there so that, you
24 know, you can go into a public place that is not
25 designed for gambling and go about your business and

Page 19:

1  then, you know, pay for gas and walk by, you know, to
2  get a soda without having to be tempted by, you know,
3  machines that are the devil to me, and quite a few
4  people that I've gambled with too.
5  Q. Let's talk about that.
6      When is the first time that you ever used a
7  Torch device?
8  A. You talking about those gambling machines?
9  Q. No. I'm talking about a --
10 A. Because I've used Torches at work since I
11 was 15-and-a-half. So, the Torch device, you're
12 talking about electronic --
13 Q. I'm talking about the basis of the Federal
14 lawsuit that you filed against two of my clients and a
15 number of other Defendants.
16 A. I can't tell you the exact date, but.
17 Q. Can you approximate for me?
18 A. Well, according to the guy that was at the
19 slot machine, you know, a few away from me, he said
20 they had been there for a month or so already. And so
21 that has to be three-plus years ago. So I can't tell
22 you the exact date. But according to that guy, they
23 had already been there for at least a month cause --
24 Q. Been where?
25 A. -- I didn't stumble on 'em.

Page 20:

1  Where was I? Oh. I've been to 'em so
2  often, it kind of gets to be a blur.
3      I'm pretty sure that was over there -- not
4  Salt Lick -- uh, Phillip 66 on West Clay.
5  Q. When did you start using Torch devices? You
6  said three years ago?
7  A. Yeah. At least according to the guy.
8  Q. I'm not asking according to the guy.
9  A. I don't under --
10 Q. When did you start using them?
11 A. I started using them the first time I saw
12 them.
13 Q. Which was when?
14 A. I'm trying to tell ya. Three-plus years
15 ago. I don't think they were in there before that.
16 And I was surprised. And the guy said, oh, they've
17 been there, you know, a good month. So, I missed the
18 grand opening by a month, according to them, but...
19 Q. How frequently have you used Torch devices?
20 A. Say that again.
21 Q. How frequently have you used Torch devices?
22 A. That's a tough question to answer. A lot.
23 Q. How many times per week?
24 A. It just depends on what week.
25 Q. How many times per year?

Page 21:

1  A. A lot. I'd have to say I visited them well
2  over 60 percent of the days. And it's hard not to go
3  in there.
4  Q. The first time that you used a Torch device,
5  did you read any words either on the device or put out
6  by the manufacturer about how the device operates or
7  anything along those lines?
8  A. No. There -- there was nothing on the
9  machine at all.
10     I did go, and I looked because I've been to,
11 you know, the certified gaming machines at the
12 casinos. Cause I was looking. They have the little
13 decal, certified gaming commission. I looked for that
14 just subconscious. I know how they play.
15 Q. But to answer the question --
16 A. I did not go in and read the rules or
17 anything.
18 Q. To this day, have you ever read any
19 representation that Torch or anyone else has put out
20 about how these devices operate? Anything along those
21 lines?
22 A. Well, if Torch put anything out, I've never
23 seen it. The only thing that I've ever seen on the
24 machine is a sticker, usually on the side, scrunched
25 in-between another machine.

**Page 22**

1  But it says sports electronics. It has
2  contact number or something. I think it has maybe,
3  you know, info about the owner. I'm not sure exactly
4  that. It says -- there's nothing else on the machine,
5  and I would have to go looking for it.
6  If you're saying Torch puts something on the
7  wall or on each individual machine telling me how to
8  play it or how it was supposed to be designed, no, I
9  never saw anything of that sort.
10  Q. Is it fair to say that every time you have
11  used what you contend was a Torch device, you did not
12  rely on any representations by Torch in any sort of
13  literature, documents, sign on the machine, anything
14  along those lines when you decided to play?
15  A. I don't understand your question.
16  Q. Sure. I think you already answered it a few
17  minutes ago, but I'm just trying to unpack what you
18  were saying.
19  Is it fair to say that when you decided to
20  play Torch devices, every time you played Torch
21  devices you did so without relying on anything that
22  Torch said about these devices, correct?
23  A. Torch never said anything about the devices.
24  Q. Fair enough. So meaning, if Torch didn't
25  say anything, according to you, there's no universe in

**Page 23**

1  which you could have relied on what Torch said,
2  correct? We can agree on that?
3  A. Yeah. I mean, Torch never said anything
4  good, bad, or indifferent. They didn't say anything.
5  They just said come play me because I got this machine
6  in here that I worked out with the owner of this
7  establishment. And there was no instructions on how
8  to play, how not to play, where to look to find
9  instructions to play.
10  Q. How frequently do you gamble?
11  A. A lot.
12  Q. A lot's, unfortunately, not a specific
13  enough answer. How frequently do you gamble?
14  A. Well, are you talking about in an hour span?
15  In a 24-hour span?
16  Q. How many days per year?
17  A. In a week.
18  Q. How many days per year?
19  A. Be more specific.
20  Q. How many days per year do you gamble?
21  A. Oh, it depends on what year.
22  Q. Last year. How many days per year did you
23  gamble in 2022?
24  A. I think I told you that before. I can't say
25  an exact amount. But I have to tell you well over

**Page 24**

1  50 percent, close to 60 percent of the days you'll
2  find me in some gambling establishment.
3  And mostly these now. Because it just so --
4  why am I gonna drive 3 miles away when I can go less
5  than 3/8ths of a mile away. Heck, I can walk there.
6  Q. Did you gamble 50 to 60 percent of the days
7  when you were working with the woman with Alzheimer's?
8  A. No. The only money that we would have, we'd
9  save. I did lots of odd jobs. She had Alzheimer's.
10  I got her to think it was a great thing that cans,
11  could collect money for 'em. A lot of times with
12  cans, I know how to scrap things out.
13  Q. Mr. Cordaro, who is Mohammed Almuttan?
14  A. Say the guy's name again.
15  Q. Mohammed Almuttan.
16  A. I think that's one of the owners of Torch
17  that we are bringing the case against.
18  Q. Did you bring the case against Mohammed
19  Almuttan because you believe he owned Torch?
20  A. Well, if he owns Torch, then that's -- I'm
21  sure that's what I went after.
22  Q. Is that why you brought the case against
23  Mohammed Almuttan because you believe he owns Torch?
24  A. Well, anybody that owns Torch is who I'm
25  trying to bring the case against. So, yes, that's why

**Page 25**

1  I've brought it against him, he owns Torch.
2  Q. Have you ever interacted with Mohammed
3  Almuttan?
4  A. I have no idea. He could walk in here now,
5  and I wouldn't know him.
6  Q. Have you ever engaged in any sort of
7  communication with Mr. Almuttan by text message?
8  A. No, never.
9  Q. Social media? Any communication at all?
10  A. I don't know the man.
11  Q. To the best of your knowledge, is it fair to
12  say you've never interacted with the man, Mohammed
13  Almuttan, in your entire life?
14  A. Not that I know of. You know, I mean, he
15  might be somebody that owns a store, and I never
16  talked to, but, you know, he checked me out. That
17  doesn't mean I know him. I don't know the man
18  personally.
19  Q. How did you -- how have you been injured or
20  damaged by Mohammed Almuttan, if at all?
21  A. And his Torch devices? Well, I've been
22  damaged by --
23  Q. By Mohammed Almuttan to be precise. And if
24  you don't --
25  A. He has damaged me personally because he is

1  ATTORNEY MILLER: Can we just get to the
2  next question? I think he's trying to help.
3  Q. (By Attorney Gelfand) Mr. Cordaro --
4  A. Yes.
5  Q. -- are there times when you sat down,
6  interacted with a Torch device, and left with more
7  money than you started with?
8  A. Very few.
9  Q. Okay. But are there times?
10  A. Yes. Because I was interrupted by somebody,
11  and I had to get to some place for an emergency, and
12  it made me check out, and I happened to be up at the
13  time.
14  But very rarely did I ever leave anything of
15  any money. I knew to go get my gas, and my cigarettes
16  before I hit the machines cause it would be all gone.
17  It happens all the time.
18  Q. You would agree with me that every time you
19  used a Torch device you did it voluntarily, correct?
20  A. Well, it wasn't like when I voted for Trump.
21  Nobody put a gun to my head. Nobody put a gun to my
22  head to put the money in the machine and start playing
23  it. So.
24  Q. It's a "yes?"
25  A. That's a yes.

34

1  Q. And you would agree with me that every time
2  you've interacted with what you contend was a Torch
3  device, you could stop at any point? In other words,
4  you could pull the money out?
5  A. Well, if I was a normal person and wasn't a
6  addicted, degenerative gambler, maybe I could, but --
7  or someone else could. But that isn't me, so I don't
8  know.
9  Q. Okay. So let me understand this for a
10  second because you're drawing a distinction, if I
11  understand your testimony correctly, between somebody
12  who has a gambling addiction and somebody who doesn't;
13  is that correct?
14  A. Say that again. I don't --
15  Q. If I understand your testimony correctly,
16  are you distinguishing between some players of Torch
17  devices who have gambling addictions and some players
18  who don't have gambling addictions?
19  A. Well, I don't get what -- there's definitely
20  people that have gambling addictions there. And maybe
21  they don't even know it yet. And maybe they haven't
22  been diagnosed.
23  Q. Let me ask it a different way.
24  A. I don't --
25  Q. Would you agree with me that of the universe

35

1  of Torch players, during the time period at issue in
2  this lawsuit, some players may have a gambling
3  addiction, correct?
4  A. Correct.
5  Q. Some players may not have a gambling -- do
6  not have a gambling addiction, correct?
7  A. I can agree with that, yes.
8  Q. Some players play for the reason you wanted
9  to, to try to win money, correct?
10  A. And it's -- it's not just that. It's --
11  Q. People play for a variety --
12  A. It's a blur. I don't know. If I --
13  Q. Mr. Cordaro, people play for a variety of
14  different reasons --
15  A. Yes.
16  Q. -- when they use Torch devices, correct?
17  A. Correct. Yes.
18  Q. And you're not claiming to be representative
19  of every single person who played a Torch device
20  during this time period?
21  A. Oh, no, I can't because that's just
22  impossible.
23  Q. It would literally be impossible, correct?
24  A. Correct. But I represent a heck of a lot of
25  'em, I bet. Because there's a lot of people that

36

1  don't want to admit they're addicted gamblers.
2  Q. So I asked you what you wanted out of this
3  lawsuit, and you told me that you want Torch devices
4  gone, correct?
5  A. That's truthfully what I want, yes.
6  Q. Would you agree with me that there are
7  people that play Torch devices that don't want that?
8  A. Well, of course, I'm sure there are. But
9  like, the owners getting that 50 percent, I'm sure
10  they don't want them gone.
11  Q. There are players that want to keep playing
12  them, correct?
13  A. Yeah. But they should have to go to the
14  casino --
15  Q. Listen to my question.
16  A. -- like everyone else that's -- that's
17  sanctified and vetted and, you know, legal.
18  Q. Mr. Cordaro.
19  A. -- with the Missouri Gaming Commission.
20  Q. Mr. Cordaro, I understand you have a lot of
21  opinions and a lot you want to say.
22  A. Well, you asked me the question, and I --
23  Q. No. Listen to me.
24  ATTORNEY MILLER: Hey, just answer. Listen
25  to the next question.

37

**Page 38**

1  THE WITNESS: I am.
2  ATTORNEY GELFAND: Please just answer my
3  question.
4  THE WITNESS: He's not getting to the
5  question.
6  ATTORNEY GELFAND: Mr. Cordaro.
7  THE WITNESS: He's meandering. Let's go.
8  Chop chop.
9  ATTORNEY GELFAND: Mr. Cordaro, please just
10  answer my question.
11  ATTORNEY MILLER: Just listen to the next
12  question. Answer his question.
13  THE WITNESS: I am but he's not asking me
14  the question that I can question. Because he's just
15  giving me too much gray space. But go ahead and
16  answer your -- ask your question.
17  Q  (By Attorney Gelfand) Mr. Cordaro, would you
18  agree with me that there are people who use Torch
19  devices that want there to be more Torch devices out
20  there?
21  A.  Well, I'm sure there could be one person out
22  of a gazillion. I -- you know, I can't say there
23  isn't, so I will agree with you on that point.
24  Q.  Would you agree with me that there are
25  people who use Torch devices that want no Torch

**Page 39**

1  devices out there?
2  A.  That want no Torch? Sure.
3  Q.  Yes.
4  A.  Yes.
5  Q.  Would you agree with me that there are
6  people that use Torch devices that want the same
7  amount of Torch devices that there currently are out
8  there?
9  A.  Sure. Sure. Those --
10  Q.  People want -- people who use Torch devices
11  want different things moving forward, correct?
12  A.  Like the rest of the world, you know. But I
13  agree, yeah. There's definitely different opinions of
14  the -- of the, you know, the pathway for Torch.
15  Q.  Why is it that you have concluded that Torch
16  devices are illegal?
17  A.  Cause I don't feel that they are sanctioned
18  by the state of Missouri, by Missouri law. I don't
19  feel it's legal to not have posted what type of
20  percentage the machines pay out. I don't think it's
21  legal for them not to be able to list like the other
22  gaming companies do how much you got, you know. They
23  have to put that in the paper somewhere. They have
24  to -- you know, how much was brought in, how much was
25  donated to the, you know, education foundation,

**Page 40**

1  whatever. How much they paid in taxes. How much they
2  paid in turnstile, admission fees. You have none of
3  that. So, you know. There's nothing that I could
4  look up on your Torch machine.
5  Q.  I'm showing you exhibit -- well, before we
6  get there.
7  Are you claiming that Torch devices pay out
8  less than slot machines in regulated riverboat
9  casinos?
10  A.  I'm not claiming anything. I'm just stating
11  that when I play them, they just didn't have a very
12  good payout.
13  Now, I have no idea what their payout is
14  because I could not find it anywhere. It's not in the
15  establishment. It's not on the machine. It's not
16  posted like, look on our website, and we'll post what
17  the Missouri law states that you have to put for
18  machines.
19  Q.  Mr. Cordaro.
20  A.  Yes.
21  Q.  Just to be very clear, would you agree with
22  me that you have no idea whether Torch devices pay out
23  more, the same, or less than casino --
24  A.  I agree --
25  Q.  If I can finish my sentence.

**Page 41**

1  A.  -- I have no idea.
2  Q.  -- than slot machines in regulated Missouri
3  riverboat casinos?
4  A.  I agree. I have no idea what their pay out
5  is. I just know --
6  Q.  And similarly, you are not claiming, are
7  you, that any Torch device you have ever played has
8  been rigged, correct?
9  A.  No, I've never claimed that.
10  Q.  Now, do you recognize Exhibit 1?
11  (Exhibit 1 was identified.)
12  A.  Yes, I do.
13  Q  (By Attorney Gelfand) When's the first time
14  you read that lawsuit?
15  A.  When I got it from -- in the mail from my
16  lawyer.
17  Q.  Did you review it -- when was that?
18  A.  Oh, gosh.
19  THE WITNESS: When was that? A month ago.
20  ATTORNEY MILLER: I can't answer for you.
21  I'm sorry, Jeff.
22  A.  A month ago or so.
23  Q  (By Attorney Gelfand) Was it already filed
24  when you got it?
25  A.  Yes, it had been filed.

**Page 54**

1  they've won or lost, how long they've played, whether
2  they relied on anything to play.
3       We'd have to look at those individually,
4  correct?
5       A.  I don't know what you're getting at to do
6  it --
7       Q.  It's a yes or no question.
8       A.  -- but if you're -- you know, if you're
9  analyzing the history of individual gamblers, then,
10 yeah, sure.  I mean --
11      Q.  But the answer is "yes" to that question,
12 correct?
13      A.  I don't even know what the question was now.
14      Q.  Please listen to my question then.
15      A.  Well, then answer it -- ask it in a question
16 that I can answer.
17      Q.  Mr. Cordaro, to determine why people are
18 playing Torch devices, we would have to look at them
19 all individually, correct?
20      A.  Correct.
21      Q.  To determine whether the people that play
22 Torch devices have an addiction, we'd have to look at
23 them individually, correct?
24      A.  Correct.
25      Q.  To determine whether a particular Torch

**Page 55**

1  player won or lost from using Torch devices, we'd have
2  to look at their situation individually, correct?
3       A.  Yeah, their won/loss total, sure.
4       Q.  "Yes?"
5       A.  Yes.  You'd have to look at each individual
6  individually.
7       Q.  To determine how frequently someone plays,
8  you'd have to look at it individually, correct?
9       A.  Well, on your machines there's no way to
10 calculate it cause they don't issue you a card or
11 whatever, you know.
12      Q.  We'd have to ask them, correct?
13      A.  You'd have to ask them, yes.
14      Q.  In other words, you'd have to look at it
15 individually, correct?
16      A.  Correct.
17      Q.  And that's the only way to get to the
18 answers to those questions, correct?
19      A.  Uh.  No.  I don't -- I mean, I'm sure I
20 could, you know...
21      Q.  Come up with another way?
22      A.  Yeah, I'm sure I could come up with another
23 way.
24      Q.  What's the other way?
25      A.  Because you're trying to pinpoint what is an

**Page 56**

1  actual typical gambler.  There is no such thing as an
2  actual typical gambler, you know.  The typical gambler
3  puts their money in and hopes he wins the jackpot on
4  the first hit, and every hit after it.  I don't -- I'm
5  not any different than anyone else that sits down at
6  the machine because it takes my money.
7       Q.  I'm showing you what I've marked as
8  Exhibit 5.
9          (Exhibit 5 was identified.)
10         THE WITNESS:  Do we need this still?
11         ATTORNEY MILLER:  No.
12         ATTORNEY GELFAND:  You can hand that back to
13 me.
14      Q.  (By Attorney Gelfand) Do you see Exhibit 5 in
15 front of you?
16      A.  I see that.
17      Q.  This is a pleading entitled "Plaintiffs'
18 Opposition to Partial Motion to Dismiss" that was
19 filed by your attorneys.
20      A.  Okay.
21      Q.  Do you see that?
22      A.  Yes, I do.
23      Q.  In this pleading, your lawyers wrote, quote:
24 Except as permitted in a constitutionally authorized
25 casino, gambling is a criminal offense.

**Page 57**

1          And then they cited, quote, a person --
2       A.  Who says it?  You're taking it -- I want to
3  see the whole context.
4       Q.  Let me read it first.  Did I read that
5  sentence correctly?
6       A.  Yeah, but you're taking it out of --
7       Q.  I'm not taking anything out of context.
8          But did I read that correctly?
9       A.  Except as permitted in a constitutionally
10 authorized casino gambling is a criminal offense.
11      Q.  Did I read that correctly?
12      A.  Yes, you did.
13      Q.  Okay.  Then the next sentence says, quote:
14 A person commits the offense of gambling if he or she
15 knowingly engages in gambling, end quote.
16         And it cites Section 572.020 of the Revised
17 Statutes of the state of Missouri.
18      A.  I see that.
19      Q.  And it says, yes, consumers were gambling.
20 Do you see that?
21      A.  I see that.  I don't know where that is, and
22 I don't know what the --
23      Q.  Do you agree --
24      A.  -- attorney says.
25      Q.  -- that you committed a criminal offense?

**Page 58**

1  A.  If -- if those machines that you put in
2  there are illegal, then I committed a criminal
3  offense.  I didn't think I was committing a criminal
4  offense.  I thought those machines were on the
5  up-and-up and were sanctioned.
6  Q.  Let me be clear.  I'm not telling you that
7  you committed a criminal offense.
8  A.  I know.  But you asked me.
9  Q.  I'm just asking --
10  A.  I told you my answer.
11  Q.  -- is that your position in this lawsuit.
12  A.  I told you my answer.
13  Q.  Would you agree with me that some members of
14  your proposed class of users of these devices may
15  choose to take the Fifth instead of answering that
16  question?
17  A.  I have no idea about that.
18  Q.  Mr. Cordaro, over the course of the last
19  several years you've testified you've used a number of
20  Torch devices at a number of places outside of St.
21  Louis City and St. Louis County, correct?
22  A.  Outside of them, yes.
23  Q.  Okay.  When's the last time you used a Torch
24  device?
25  A.  I hate to say it was after I was involved

**Page 59**

1  with this.
2  Q.  When's the last time you used a Torch
3  device?
4  A.  I'm trying to think.  It had to be a month
5  ago, three, four.
6  Q.  So to be clear, you filed this lawsuit, and
7  then after you filed this lawsuit claiming to be
8  damaged by Torch devices you played Torch devices?
9  A.  Addiction.
10  Q.  Is that true?
11  A.  It's a real MF, and I have it.  And I went
12  into the store.
13  Q.  Where?
14  A.  It was at -- the x station on -- hold on.
15  I'm not sure I went in there.  But they wouldn't take
16  my card out at the pump, so I wandered in there.  And
17  I went to use the restroom, and then I heard some girl
18  kind of scream a little bit because she won some
19  money.  So, I went to go check it out.  Next thing I
20  know, I'm digging in my wallet to play.
21  Q.  To be clear, the girl you heard scream won
22  money playing a Torch device?
23  A.  Yeah.  Yeah, people win some money in there.
24  You think everybody going in there would lose all the
25  time?  Nobody'd go back.  You know, you got to have

**Page 60**

1  that.  You got to have that pull.
2  ATTORNEY GELFAND:  Thank you.  Mr. Cordaro,
3  I don't have any further questions for you at this
4  time.  I think some of the other lawyers may have
5  questions.
6  ATTORNEY MILLER:  Now might be a good time
7  for a break.  Take five.
8  THE WITNESS:  Are you done forever?
9  ATTORNEY GELFAND:  No, I'm not done forever.
10  ATTORNEY MILLER:  He might have some at the
11  end.  There's another attorney --
12  THE WITNESS:  I got to get him in here.
13  He's gotta go play softball or something.  It's only
14  3:03.
15  ATTORNEY GELFAND:  We can go off the record,
16  if we haven't already.
17  VIDEOGRAPHER:  All right.  The time now is
18  3:03 p.m.  We're going to go off the record.
19       (Recess.)
20  VIDEOGRAPHER:  The time is now 3:15 p.m.
21  Central.  We are back on the record.
22       [CROSS-EXAMINATION]
23  QUESTIONS BY ATTORNEY CARR:
24  Q.  Mr. Cordaro, hi.  I'm Chandler Carr.  I'm an
25  attorney representing three of the Defendants:  Torch

**Page 61**

1  Electronic, Steven Miltenberger, and Warrenton Oil
2  Company.
3  I have a few follow-up questions for you.
4  And first, I -- you know, I just -- so, in
5  your filings, and I'm talking specifically about in
6  the Complaint, and then in this Affidavit that you
7  submitted.  I -- you talk about specific instances of
8  playing the devices, and you have dollar amounts.
9  And it just kind of stuck out to me, you
10  know, compared to the testimony you just gave us about
11  your income and what you -- apparently, on
12  February 3rd -- I'm wondering if you can tell us about
13  what happened on these instances where you spent -- I
14  mean, February 3rd, specifically.
15  Can you walk me through that day where you
16  spent $450 playing a Torch device?
17  A.  Yeah.  I can.  I dropped somebody off, and I
18  went to go get gas at the FastLane.  And I just got
19  paid that day.  So, unfortunately, I sat down at the
20  machine and put in probably 50 bucks.  Didn't win
21  anything.  And the bad thing is there's an ATM
22  probably within, you know, five steps of there.  So, I
23  went and pulled out another three, 400 bucks.  I don't
24  know how much I had in my wallet.  But I know I lost
25  450 bucks cause my account was down to zero.

**Page 70**

1  nature.
2    So, what -- what, to you, kind of makes what
3  you've described as a slot machine, a slot machine?
4    A.  Well, something that, you know, you're gonna
5  put in and they -- they give you a chance to win
6  direct cash back.
7    Amusement games, you're gonna win a stuffed
8  Barney or, you know, some extra tickets, you know.
9    This game, you put money in, you have a
10 chance to win direct money.
11   Q.  Does it matter to you whether you know that
12 you're going to win or lose?
13   A.  Well, you don't know my luck.  I know I'm
14 gonna lose before I even get there.  I could drive
15 down the road and throw the money out the window and
16 have the same luck.
17   But, I go back.  Like that song by Steely
18 Dan, "Go do it again, Jack, go back."  That's the part
19 of an addiction.
20   Q.  So, have you ever used the prize viewer
21 feature of a Torch machine?
22   A.  I did after I realized they were there.
23   Q.  Okay.  When was that?
24   A.  Oh, about the fourth -- third -- it was the
25 fourth time that I went in to play them.  I saw it,

**Page 71**

1  and I thought it was the -- previewed of the rules.
2  You know what I mean?  They got in there, and then
3  they tell you what, you know, combination wins, and
4  blah-blah-blah for each individual game.
5    That's what I thought that was a preview of
6  something.  I never hit it till four times in there a
7  guy and girl were playing and that, and they lost
8  their money.  She said:  Oh!  Wait a minute.  Preview
9  it!  Preview it!  You know, so I was sitting there,
10 and I kind of watched what he did.  And, you know, it
11 came up and said, oh, I need a dollar to win 50 cents.
12 Because it came up he was gonna win 50 cents on a
13 50-cent bet.  But you can only -- the least you can
14 put in there is a dollar.
15   So, that's when I learned it had a preview.
16 I wish I would have known the first three times.  I
17 might have been leaving some money on the -- on the
18 game.
19   Q.  So, have you used the prize viewer feature
20 then?
21   A.  Yes, I used it after that.
22   Q.  Do you use it --
23   A.  But no, you don't -- nobody uses that prize
24 viewer on every hit.  You'll watch 'em.  It's just
25 like a regular casino.  You know, if you maybe want to

**Page 72**

1  prize view because you're changing your bet and want
2  to see what was left on, you know, 50-cent or a dollar
3  bet, you know.
4    You don't see that many people use the prize
5  viewer.  You got people that don't have any money,
6  they're prize-viewing every one of 'em games and on
7  there looking to see if somebody left the money on
8  there.
9    Q.  So, you've seen some people using it with
10 some frequency?
11   A.  I don't know what you mean by "frequency,"
12 you know.  Once out of every 50 hits, is that
13 frequent?  You know.
14   Q.  Well, I just mean in terms of people --
15   A.  It's all relevant to the -- to the game and
16 each individual.  To me it is.
17   Q.  Sure.  So some individuals use it and some
18 individuals don't.
19   A.  Correct.
20   Q.  But there --
21   A.  There's no instructions on the machine.
22 There's nobody that tells you to use it.  They don't
23 really need it.  There's nothing that -- that explains
24 what it's for.  It's just by luckin' out like I did.
25 Or, you know, somebody that knows the machines that

**Page 73**

1  brings you in there for the first time and explains
2  it.
3    But there's no Torch Electronic instructions
4  being, you know, fed out there to tell you how to play
5  the game.
6    Q.  From your experience, has that feature been
7  available on all of the Torch devices?
8    A.  I guess.  I mean, I haven't played all the
9  Torch devices.
10   Q.  Sure.  So, in terms of where you've played,
11 you've listed a few specific device -- or locations in
12 St. Charles County.  You also mentioned earlier that
13 you played in a few other counties.
14   Do you -- do you know how many locations
15 you've played?
16   A.  In total?  My whole time I've ever gambled
17 in this situation?  No, I don't.  I have no idea how
18 many.
19   Q.  Okay.  And you listed these specific
20 locations because those are the ones that you could
21 recall?
22   A.  Correct.
23   Q.  Do you remember when you played?
24   A.  It states it on there.
25   Q.  Okay.  There is -- I mean -- you say on many