

# PohlmanUSA
## Court Reporting and Litigation Services

Patrick Romano

June 16, 2023

Patrick Romano, et al.

vs.

Torch Electronics, LLC, et al.

**Page 14**

1  Q. The first time you claim you lost $3,
2  correct?
3  A. Yes.
4  Q. How much did you play?
5  A. I put in a $20 bill. I played for a couple
6  of minutes, and I gave up. I knew I couldn't win.
7  Q. We'll get back to that in a second.
8     The second time you claim you lost $20,
9  correct?
10 A. Yes.
11 Q. And the third time you claim you lost $18,
12 correct?
13 A. Yes.
14 Q. So, in total, is it fair to say you're
15 claiming to have lost $41 by playing Torch devices?
16 A. Yes.
17 Q. Are there any other places that you have
18 ever played a Torch device?
19 A. No.
20 Q. Do you know Mohammed Almuttan?
21 A. No.
22 Q. Does that name mean anything at all to you?
23 A. No.
24 Q. Have you ever been to a place called
25 "Mally?"

**Page 15**

1  A. No.
2  Q. To be clear, as you sit here today
3  testifying in this deposition, are you claiming to
4  have been damaged or injured in any way, shape, or
5  form by either Mohammed Almuttan or Mally, Inc.?
6  A. I don't know them. So, I can't give you a
7  direct answer.
8  Q. Are you claiming that you've suffered any
9  sort of injury or monetary loss or --
10 A. I suffered monetary loss.
11 Q. As a result of anything that Mohammed
12 Almuttan or Mally?
13 A. I don't know.
14 Q. Or any of their activities?
15 A. I don't know who they are.
16 Q. Okay. So, let me ask this a different way.
17    Can you articulate today any ways in which
18 you claim to have suffered any injury, damage, or
19 economic loss as a result of any conduct by Mohammed
20 Almuttan, or Mally, Inc.?
21 A. I can answer the same way. I do not know
22 them. I've lost money in these machines. I was
23 gambling with a $20 bill in each machine. A couple
24 minutes. Didn't win. Left.
25    The names you're asking about, I know

**Page 16**

1  nothing about them. I don't know who they are.
2  Q. To the best of your knowledge, have you ever
3  been to a market or a store called Mally?
4  A. No.
5  Q. The first time you saw one of these devices,
6  that appears to have been in Kingdom City, Missouri?
7  A. Yes.
8  Q. January 3rd?
9  A. Yes.
10 Q. What time of day was that, approximately?
11 A. 7:30, quarter to 8:00 in the morning. Cause
12 I usually leave St. Louis at 6:00 o'clock in the
13 morning.
14 Q. What, if anything, did you read or review
15 about the device that you played prior to playing it?
16 A. Nothing.
17 Q. So, to the extent that Torch or any other
18 entity put out any written materials about how the
19 device operated or what, if anything, the device was
20 or would do, is it fair to say you did not review any
21 of those prior to deciding to play a Torch device?
22 A. Yes.
23 Q. Why did you play the device?
24 A. I wanted to win money. It's a gamble.
25 Q. Did you consider it gambling?

**Page 17**

1  A. I do consider it gambling.
2  Q. At the time did you consider it gambling?
3  A. I've always considered it gambling, yes.
4  Q. Are you a gambler?
5  A. No.
6  Q. Approximately how many times a year do you
7  engage in activities that you consider gambling?
8  A. Those three times. I -- I do not gamble.
9  Q. Do you go to casinos?
10 A. Yes.
11 Q. How many times a year do you go to casinos?
12 A. Twice a month I take my wife.
13 Q. To a particular one or to multiple?
14 A. River City and Hollywood.
15 Q. Are you a member of any casino, for lack of
16 a better way of putting it, rewards programs where
17 they track what you play?
18 A. I have a card, but I never play.
19 Q. Is the card in your name?
20 A. Well, my wife has a card. And I may have
21 gotten a card about 10 or 15 years ago, but I've never
22 played.
23 Q. So, when you go to a casino with your wife,
24 what do you could?
25 A. I manage her money.

5 (Pages 14 to 17)

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:23-cv-04043-BCW   Document 72-3   Filed 07/14/23   Page 2 of 7

1  Q. What does that mean?
2  A. That means if she loses too much, I have to
3  take her out of the casino.
4  Q. How much is too much?
5  A. She's on a $200 budget whenever we go.
6  Q. Do you ever gamble in horse tracks or dog
7  races, or any online betting, sports betting, anything
8  along those lines?
9  A. No.
10 Q. So, what was different about this
11 January 3rd, 2023, morning that inspired you to say I
12 want to make some money?
13 A. Oh, what the hell. I'll put in a $20 bill
14 and see if I can win some money.
15 Q. Prior to putting the $20 bill into the
16 machine or into the device, what, if anything, did you
17 do with respect to the device?
18 A. Can you repeat that?
19 Q. Prior to putting money into the device --
20 A. Yeah.
21 Q. -- what, if anything, did you do with
22 respect to the device?
23    Did you interact with it?
24    Did you push any buttons?
25 A. No. I didn't touch it.

18

1  Q. What happened when you -- what game did you
2  play?
3  A. Oh, I couldn't tell you. I do not know.
4  Q. What do you recall about the experience of
5  the device?
6  A. It has bells and whistles, and that's it.
7  I -- I don't -- I don't know what it -- what kind of
8  game it was. I don't remember the graphics on the
9  front screen. I can't tell you anything more than
10 that.
11 Q. Approximately how many -- first of all, on
12 January 3rd, 2023, was it just one session of play, so
13 to speak?
14 A. Yeah, it was a couple of minutes.
15 Q. Approximately how many --
16 A. How many times did I hit the button?
17 Q. Sure.
18 A. Only a few times.
19 Q. Less than five?
20 A. Yeah, I would say five or less.
21 Q. What were the results, so to speak, every
22 time you did it in those approximately five or less
23 times?
24 A. I put in a dollar, maybe won $2, and then
25 lost on the next one. And I never recouped my $20, so

19

1  I got up and left.
2  Q. And to be clear, you left with $17, correct?
3  A. Yes.
4  Q. Of the five or less times that you played,
5  there were specific instances where you did win,
6  correct?
7  A. Yeah, yes.
8  Q. Then, is it fair to say that you decided to
9  continue pressing your luck, so to speak, in the hopes
10 of winning more?
11 A. Yes.
12 Q. You testified that the reason you decided to
13 play on January 3rd of 2023 was because you wanted to
14 win money, correct?
15 A. Yes.
16 Q. Would you agree with me that you would be
17 speculating as to why everyone that's ever played one
18 of these devices chose to play on any given time?
19    In other words, you would have no idea why
20 those people played, what their motive was?
21 A. Correct.
22 Q. And would you agree --
23 A. I would assume that whoever plays on these
24 machines wants to win money.
25 Q. And I appreciate your clarification. I

20

1  don't want you to assume anything. You're under oath
2  in a deposition just answering questions.
3  A. Okay.
4  Q. And so, I think you already answered my
5  question, but it would be just that it would be an
6  assumption, it would be speculation as to why people
7  play, correct?
8  A. Yes.
9  Q. Okay. After January 3rd of 2023, was the
10 next time you played January 28th of 2023?
11 A. Yes.
12 Q. And that was inside a Las Trojas restaurant?
13 A. Yes.
14 Q. If I'm pronouncing that correctly.
15 A. I think so. Cause I don't know the correct
16 pronunciation either. It's a Mexican restaurant.
17 Q. We'll go with Las Trojas.
18    To the best of your knowledge, does Mohammed
19 Almuttan or Mally, Inc., do either of those Defendants
20 that you sued in this lawsuit, have anything to do
21 with the Las Trojas restaurant in Jefferson City,
22 Missouri?
23 A. No.
24 Q. Do they have anything to do with the
25 FastLane in Kingdom City, Missouri?

21

**Page 22**

1  A. I have no idea.
2  Q. Do they have anything to do with the
3  FastLane in Jonesburg, Missouri?
4  A. I have no idea.
5  Q. What time of day did you play the Torch --
6  what you believe was the Torch device in Las Trojas
7  restaurant?
8  A. I was there with my wife for dinner, so
9  maybe about 8 -- about 7:00 o'clock because they were
10  starting to get busy.
11  Q. Why did you play that particular machine or
12  device?
13  A. They sat us over close to the bar. And when
14  I was looking at the bar, there was a machine down at
15  the end of the bar, and I thought, I'm going to throw
16  in a $20 bill.
17  Q. For what reason?
18  A. To win money. Pay for my dinner.
19  Q. After you lost the $3 --
20  A. I lost $20 on that machine.
21  Q. After you lost the $3 25 days before --
22  A. Uh-huh.
23  Q. -- what made you think you would make money?
24  A. I don't. I took a gamble.
25  Q. How long did you sit down in that section in

**Page 23**

1  Las Trojas restaurant?
2  A. Oh, it was only about five minutes, and my
3  drinks came to the table, and I got off the machine.
4  I wasn't going to put another $20 in.
5  Q. How many -- do you remember on that
6  particular time --
7  A. I don't.
8  Q. -- what specific game you played?
9  A. I don't.
10  Q. Do you remember approximately how many times
11  you pushed the button specifically?
12  A. No, I don't.
13  Q. Now, on February 2nd, 2023, that was
14  approximately five or so days after Las Trojas, you
15  were in a FastLane in Jonesburg.
16  A. Yes.
17  Q. What time of day, approximately?
18  A. That would have been an early morning.
19  7:00 o'clock.
20  Q. Why did you play what you believed was a
21  Torch device on that day?
22  A. Caught my eye as I was walking out the door,
23  and had a $20 bill in my pocket, and I thought I'd
24  gamble with it.
25  Q. Did you think you would win?

**Page 24**

1  A. I always think I'm gonna win, yes.
2  Q. When you played on January 28th, so that --
3  going back to that Las Trojas restaurant day.
4  A. Okay.
5  Q. Were there any instances where you won?
6  A. I can say yes. I don't know the exact
7  amount, but it was -- I think the biggest one, I won
8  $6, and then, I put the money right back in trying to
9  win at least my money back plus whatever else I won.
10    (Sneezing.)
11    THE WITNESS: Bless you.
12  Q. Similarly, on February 2nd at the FastLane
13  in Jonesburg, Missouri, approximately how many times
14  did you interact with that device?
15  A. I don't have an exact answer for you.
16  Q. You also put $20 in?
17  A. Yes.
18  Q. And you left with $2?
19  A. Correct. Yes.
20  Q. Similarly, you won some instances, you lost
21  some instances?
22  A. Yep.
23  Q. Is that accurate?
24  A. Yes.
25  Q. And like I asked you before, these were the

**Page 25**

1  only three times you've ever interacted with what you
2  believe was a Torch device, meaning played a Torch
3  device?
4  A. Yes.
5  Q. Would you agree with me that you voluntarily
6  played these devices?
7  A. Yes.
8  Q. When you played these devices, were there a
9  number of Torch devices in these three locations or
10  just one?
11  A. FastLane in Jonesburg had maybe five
12  machines. And I picked the corner machine closest to
13  the door.
14  Q. I'll show you what we've previously marked
15  in a prior deposition as Exhibit 1.
16    ATTORNEY GELFAND: Which I will represent
17  for the benefit of the parties by Zoom is just a copy
18  of the Class Action Complaint that was filed in this
19  case.
20  Q. (By Attorney Gelfand) Do you recognize that
21  document?
22  A. I've read it before, yes.
23  Q. When's the first time that you read that
24  document?
25  A. Within the last week.

**Page 26**

1  Q. So, to be clear, is it fair to say you did
2  not read this document prior to it being filed?
3  A. That I'd have to ask.
4  Q. You can't ask any -- you know whether you
5  read it prior to it being filed?
6  A. Well, I -- I don't -- I guess so.
7  Q. Let me ask this. This was filed, based on
8  the court stamp, on March 3rd of 2023 --
9  A. Okay.
10  Q. -- so it was well more than a week ago.
11  A. Okay.
12  Q. So, is it fair to say you did not read this
13  document prior to it being filed?
14  A. Correct. Yes.
15  Q. Why did you -- or why do you want to be a
16  class representative in the event that the court
17  certifies a class -- a class action?
18  A. I can go back along ways. I used to gamble
19  a lot. It was a bad habit. And I know this is
20  gambling. And I thought the machines were legal.
21     I happened to be talking to my attorney one
22  time, not too long ago, and -- about a different case,
23  and I happened to tell him about this, and he told me
24  that they were illegal machines. And the best thing
25  for it, if it was illegal, take 'em off the street.

**Page 27**

1  Go to the casino where it's legal.
2  Q. Let's back up for a second.
3     Why do you believe they are an illegal
4  machine?
5  A. I was told they were illegal.
6  Q. What are you hoping to get out of this
7  lawsuit?
8  A. The machines taken off the street. Cause I
9  know how addicting they can be.
10  Q. So, to be clear, you're not sitting here
11  hoping to obtain money for any sort of injuries or
12  losses?
13  A. I'd be -- I would be happy to see them off
14  the street.
15  Q. Is that a "yes" to my question?
16  A. Yes. Sorry.
17  Q. That's okay. Have you been promised
18  anything in exchange for being the class
19  representative if, in fact, you are a class
20  representative in a class action?
21  A. No.
22  Q. There are certain allegations in the
23  complaint related specifically to Mohammed Almuttan
24  and Mally, Inc. These are the two entities I
25  previously asked you about. Correct?

**Page 28**

1  A. Correct.
2  Q. And you've testified that you know nothing
3  about these -- this individual or this entity,
4  correct?
5  A. Yes.
6  Q. Paragraph 17 states that: On or about
7  April 6th, 2022, Defendant Mohammed Almuttan pled
8  guilty to knowingly violating two statutes for his
9  involvement in a conspiracy to defraud the United
10  States through the use -- I'm sorry -- through the
11  sale of contraband cigarettes.
12     Do you see that in 17 where I just read?
13  A. Yes.
14  Q. Is that true?
15  A. If it says so.
16  Q. It has to be true just because it says? I
17  see.
18  A. Well, I can't answer to it. I can't give
19  you a true answer. I know nothing about that.
20  Q. Okay. Paragraph 18 references that:
21  Defendant Mohammed Almuttan was involved in a scheme
22  to bribe aldermen in the City of St. Louis, including
23  Board President, Lewis Reed; 21st Ward Alderman, John
24  Collins-Mohammed; and 22nd Ward Alderman, Jeffrey
25  Boyd. This scheme led to the federal criminal

**Page 29**

1  conviction of the three aldermen.
2     Is that true?
3  A. I have heard that in the news only because I
4  recognize Lewis Reed. I had met him once before,
5  maybe 20 years ago.
6  Q. Do you have any firsthand knowledge about
7  whether anything --
8  A. No.
9  Q. -- that I just read happened?
10  A. Nope.
11  Q. Paragraph 20 references that Mally owns and
12  operates a convenience store at 7445 West Florissant
13  Avenue, St. Louis, Missouri.
14     As I previously asked you more broadly about
15  Mally, have you ever been to a convenience store at
16  that location?
17  A. No.
18  Q. Is everything in this lawsuit true?
19  A. I haven't read everything word for word.
20  Q. So, is it fair to say that sitting here
21  today under oath, your truthful answer is you have no
22  idea whether everything in this lawsuit is true?
23  A. I'm assuming that, once again, if it -- if
24  it was filed with the -- with the courts, then it's
25  true.

**Page 30**

1  You're asking me a legal question that I
2  can't answer.
3  Q.  Is every fact stated in this lawsuit true?
4  A.  I can't answer.
5  Q.  Because you don't know.
6  A.  I don't know.
7  Q.  You testified that your goal in this lawsuit
8  is that you want these Torch devices essentially --
9  A.  Wiped out.  Off the street.
10  Q.  -- mushed, wiped out?
11  A.  Yep.
12  Q.  You want no one to be able to play these
13  Torch devices; is that correct?
14  A.  Yes.
15  Q.  Would you agree with me that some people who
16  play these Torch devices may not want that same goal?
17  A.  I don't know their thinking.  So, I can't
18  answer that correctly.
19  Q.  Would it be fair to assume that --
20  A.  You told me not to assume, and now you're
21  assuming.
22  Q.  And now I'm asking you to assume.  That's
23  fair.  Common sense, though.
24  Would it be fair to assume that some people
25  want to continue playing these devices?

**Page 31**

1  A.  Yes.
2  Q.  In other words, what you want out of this
3  lawsuit may not be --
4  A.  It's personal.
5  Q.  It's personal.  It's not what other people
6  want, correct?
7  A.  I -- I can't read their minds.
8  Q.  At least you're not sitting here saying that
9  you're completely confident that what you want out of
10  this lawsuit is what other people want?
11  A.  You know what, keep the machines there and
12  don't let them put in any money and don't let them
13  take any money out.  See how long they last.  Let 'em
14  pay rent.
15  Q.  But to answer my question, and I think you
16  already did, but I'm going to ask it for the record.
17  You're not sitting here saying --
18  A.  No.
19  Q.  -- everyone who plays these devices wants --
20  or who has played these devices during the time period
21  at issue in this lawsuit --
22  A.  Want --
23  Q.  -- wants the same thing you want, correct?
24  A.  Correct.
25  Q.  For each of the Torch devices that you've

**Page 32**

1  testified playing --
2  A.  Uh-huh.
3  Q.  -- if you recall, were there any notices or
4  words written on those devices?
5  A.  No.  That -- I can't recall that, no.
6  Q.  Meaning there may have been, there may not
7  have been, correct?
8  A.  Correct.
9  Q.  If there were, you didn't rely on any of
10  that to play, correct?
11  A.  I did not read any -- anything.
12  Q.  And you can't rely on something you don't
13  read, correct?
14  A.  Correct.
15  Q.  Do you know personally any of the other
16  named Plaintiffs in this lawsuit?
17  A.  No, I do not.
18  Q.  So, to be clear, Joshua Wilson, Miss
19  Christensen, Mr. Cordaro, Miss Weaver, Miss McGee, and
20  Miss Bolden, have you ever met or spoken with any of
21  those people?
22  A.  Yesterday was the first time I was
23  introduced to them.  And as I was coming in, they were
24  going out.  So, I didn't know if they had their depo
25  yesterday or what.

**Page 33**

1  Q.  So, other than exchanging pleasantries.
2  A.  That's it.
3  Q.  Okay.  But to the extent these people have
4  ever interacted with a Torch device or expressed any
5  motives as to why, or what their experience was, or
6  whether they won or loss, you don't have any firsthand
7  knowledge of any of that, correct?
8  A.  I do not.
9  Q.  And they have not said anything to you about
10  that, correct?
11  A.  Correct.
12  Q.  You have not said anything to them about why
13  you've interacted with these Torch devices or what
14  your experiences were, correct?
15  A.  Correct.
16  Q.  I've asked you about Mohammed Almuttan.  Do
17  you know Rami Almuttan?
18  A.  Nope.
19  Q.  Why did you sue Mohammed Almuttan and Mally,
20  Inc., if you don't know anything about them?
21  A.  It's not them.  It's the equipment.  I don't
22  know them.  I'm only here to hope to take the
23  equipment off the streets.
24  Q.  You testified that you are here only
25  comfortable testifying about your own experience and

9 (Pages 30 to 33)

```
 1   Torch, three, five, ten.  I have no idea.  I have just
 2   played the one closest to the door.
 3        Q.   The January 3rd, 2023 occasion referenced in
 4   paragraph 5, that was, I think, you testified, the
 5   very first time that you alleged to have played a
 6   Torch device, correct?
 7        A.   For -- correct.
 8        Q.   And was that before or after you had heard
 9   about this potential litigation?
10        A.   That was before.
11        Q.   And was that before or after you had been
12   informed that the Torch devices were illegal?
13        A.   That was before.
14        Q.   How long before this January 3rd, 2023
15   occasion, how long had it been prior to that since you
16   played a casino slot machine?
17        A.   Years.  Decades.  I go into the casino, I do
18   not play them.  And I manage --
19        Q.   How many years --
20        A.   -- my wife.
21        Q.   Sorry.  I didn't mean to cut you off.
22        A.   That's all right.
23        Q.   And prior to this January 3rd, 2023,
24   occasion, is the same response that you haven't
25   gambled in any fashion for those same decades that you
                                                         50
```

```
 1   mentioned?
 2        A.   Correct.
 3        Q.   So, I'm just a little confused on why a guy
 4   who says, you know, you have this experience, and it
 5   led you to never ever want to gamble again, which I
 6   respect, suddenly, as you say, decades later on
 7   January 3rd, 2023, decided on that occasion to throw
 8   $20 into a machine and, as you say, intend to gamble?
 9        A.   I just decided to throw in 20 bucks, that
10   was it.  I can control myself if I really wanted to,
11   and I controlled myself to lose $20.
12        Q.   Was your intent in doing that to position
13   yourself to potentially become a plaintiff in this
14   litigation?
15        A.   No.  I already told you that I had no idea
16   about them.
17        Q.   So, at that time, you believe the machines
18   to be legal?
19        A.   At that time, yes.
20        Q.   When was the first occasion that you
21   believed that the machines were illegal?
22        A.   I couldn't tell you an exact date.  But it
23   wasn't too long after that I was in the office of my
24   attorney, Karl Lemp, and I just happened to tell him I
25   threw a couple of bucks into a machine and lost it.
                                                         51
```

```
 1   And he brought it up that -- that they weren't legal
 2   machines.
 3        Q.   And --
 4        A.   Then we started --
 5        Q.   -- I thought this was just chitchat.  This
 6   wasn't -- you weren't soliciting him, advice, on that
 7   particular --
 8        A.   No.  This was about dif --
 9        Q.   -- matter?
10        A.   -- this was about a different case.
11        Q.   And then did he refer you to Joe Jacobson or
12   somebody there, Plaintiff's counsel, about this case
13   and potentially becoming a Plaintiff?
14        A.   Yes.
15        Q.   Do you know, did that happen between
16   January 3rd and January 28th of 2023?
17        A.   Oh, no.  It was a couple months after I had
18   played them.
19        Q.   Okay.  Are you -- you've said a few times
20   that you now believe that the machines are illegal.
21   Why do you believe that the machines are legal -- are
22   illegal?  Sorry.
23        A.   Because it was told to me.
24        Q.   You, personally, I -- you, personally, do
25   you have an understanding of why you believe that the
                                                         52
```

```
 1   Torch devices are illegal under Missouri law?
 2        A.   Personally, I -- I do.  I don't -- I don't
 3   know 100 percent the legalities about them.  I've been
 4   told that they feel that they've been illegal, and I
 5   go with that.
 6        Q.   Do you know --
 7        A.   I'm not an attorney to understand the whole
 8   law.
 9        Q.   No, I -- I appreciate that.
10             Do you know what the definition is of a,
11   quote, gambling device, end quote, under Missouri law?
12        A.   Do you?
13             No, I do not.  I couldn't tell you word for
14   word unless I read it.
15        Q.   Okay.  Do you know if there's any sort of
16   specific elements that a device must have in order to
17   be classified a, quote, gambling device, end quote,
18   under Missouri law?
19        A.   No.
20        Q.   If I told you that it had to have an element
21   of chance, would you have any reason to dispute that?
22        A.   I don't know.
23        Q.   You don't know one way or another, right?
24        A.   Correct.
25        Q.   But I -- fair to say, just as you understand
                                                         53
```